**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; FIEL HOUSTON<br><br>                 Plaintiffs,<br><br>    v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; and STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety<br><br>                 Defendants. | Case No. <u>3:21-cv-00178</u> |

**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   A.  Relevant Immigration Laws. ................................................................................... 2

   B.  Title 42 Policy. ......................................................................................................... 3

   C.  Asylum Seekers in Texas. ....................................................................................... 4

   D.  The Governor's Executive Order Banning Transport. ............................................ 5

   E.  The Plaintiffs. .......................................................................................................... 7

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ...................................................................................................................... 8

   I.  Plaintiffs Are Likely to Succeed on the Merits. ...................................................... 8

      A.  The Order Is Preempted. ...................................................................................... 9

      B.  The Order Violates Intergovernmental Immunity. ............................................ 17

   II.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ............................ 18

   III.  The Balance of Equities and Public Interest Favor an Injunction. .................... 20

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*,
  567 U.S 387 (2012)................................................................................................................ passim

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ................................................................................................... 18

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ........................................................................................ 10, 12, 13

*DeCanas v. Bica*,
  424 U.S. 351 (1976)...................................................................................................................... 9

*Galvan v. Press*,
  347 U.S. 522 (1954)...................................................................................................................... 9

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)................................................................................................................. 9, 11

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956).................................................................................................................... 18

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013)....................................................................................................... 12

*McCulloch v. Maryland*,
  4 Wheat. 316 (1819) ................................................................................................................... 17

*North Dakota v. United States*,
  495 U.S. 423 (1990).................................................................................................................... 17

*Padilla v. Kentucky*,
  559 U.S. 356 (2010)...................................................................................................................... 4

*Speaks v. Kruse*,
  445 F.3d 396 (5th Cir. 2006) ........................................................................................................ 8

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948).................................................................................................................... 12

*Truax v. Reich*,
  239 U.S. 33 (1915)......................................................................................................... 9, 12, 17

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ........................................................... 11

*United States v. Eckford,*
    910 F.2d 216 (5th Cir. 1990) .............................................................. 11

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ........................................ 12, 13, 14, 15

**Statutes**

6 U.S.C. § 211(c)(8) ............................................................................... 2

6 U.S.C. § 279(g)(2)(A) .......................................................................... 4

8 U.S.C. § 1101 ...................................................................................... 4

8 U.S.C. § 1101(a)(27)(J) ....................................................................... 3

8 U.S.C. § 1103(a)(1) .............................................................................. 2

8 U.S.C. § 1158(a) ............................................................................... 2, 3

8 U.S.C. § 1182 ...................................................................................... 4

8 U.S.C. § 1182(d)(5)(A) ......................................................................... 3

8 U.S.C. § 1187 ...................................................................................... 4

8 U.S.C. § 1225 ...................................................................................... 4

8 U.S.C. § 1227 ...................................................................................... 4

8 U.S.C. § 1229(a)(1)(F)(i) ............................................................ 3, 11, 17

8 U.S.C. § 1229(a)(2)(A) ............................................................... 3, 11, 17

8 U.S.C. § 1229(c) ........................................................................ 3, 11, 17

8 U.S.C. § 1229a ............................................................................... 3, 11

8 U.S.C. § 1231(b)(3)(A) ......................................................................... 3

8 U.S.C. § 1324(a)(1)(A) ........................................................................ 15

8 U.S.C. § 1357(g) ................................................................................. 10

iii

8 U.S.C. § 1373(c) ............................................................................................ 10

## Regulations

8 C.F.R. § 247a.12(b)(6)(iv) ................................................................................ 5

8 C.F.R. § 1003.14(a) ......................................................................................... 3

8 C.F.R. § 1003.20(a) ......................................................................................... 3

86 Fed. Reg. 38,717 (July 22, 2021) .................................................................. 4

## Other Authorities

Executive Order GA-37 (July 28, 2021) ...................................................... passim

Executive Order GA-38 (July 29, 2021) ............................................................ 16

State of Texas Emergency Management Plan: Basic Plan (Feb. 2020) ......................................... 6

Tex. Gov't Code § 418.173(a)-(b) ..................................................................... 6

## INTRODUCTION

The Governor of Texas, through his executive order banning the transport of migrants, is seeking to impose his own punitive immigration rules that are explicitly designed to override decisions by federal immigration officials.  His executive order specifically targets migrants whom DHS has released to reside in the United States in the exercise of its statutory authority—often so that they can pursue humanitarian relief, including asylum, that they are entitled to seek under federal and international law.  The order allows state officers to unilaterally bar their movement within Texas in an effort to corral them at the border, despite CBP's decision to release them.  It directs state officers to decide for themselves whether individuals could have been subject to complex federal border policies—policies that necessarily require multiple immigration-status determinations.  The order instructs officers to detain people based on these status determinations unilaterally, without federal direction and supervision.

The order would upend the federal immigration system, as the United States has explained. U.S. TRO Br. 7-17, *US v. Texas*.  But it would also inflict terrible harms on people throughout Texas.  Drivers and passengers would face a real danger of arbitrary detention any time state officers suspect them of transporting people with certain immigration statuses and histories. Drivers could have their vehicles impounded or rerouted to the border, and they could face $1,000 fines, all based on the immigration judgments of state officers who have no training in the complexities of immigration law and no authority to make immigration determinations. Understandably, the order is already chilling people's movement in profound ways.

The order would also devastate the daily lives of thousands of immigrants and asylum seekers.  Migrants living in the United States frequently carpool, take buses, or rely on family members, employers, and other members of the community to get to work, school, doctor visits,

grocery stores, and countless other destinations.  Without access to basic transportation, many asylum seekers would be unable to join family, get medical care, attend ICE check-ins, or get to immigration court hearings at locations designated by the federal government.  Increasing numbers of migrants would be forced to stay in border towns, in shelters, or on the street.  Service providers and humanitarian volunteers like Plaintiffs would face huge fines, the loss of their vehicles, and the inability to carry out their work and religious missions.  Long-established border shelters could be forced to shut down.

The executive order is an unprecedented attempt to disrupt the federal immigration system and lives of immigrants who have the federal government's explicit permission to live in the United States.  The order is preempted because it contradicts decisions made by Congress, and it empowers state officers to make their own immigration decisions unilaterally, without federal direction and supervision.  And it violates intergovernmental immunity, because it bars individuals and organizations like Plaintiffs from assisting the federal system for those seeking legal protection in the United States.  The executive order must be enjoined.

## BACKGROUND

### A. Relevant Immigration Laws.

Congress has directed DHS to "enforce and administer all immigration laws," including laws governing the "admission of persons who seek to enter or depart the United States" and laws governing "the detection, interdiction . . . [and] short-term detention . . . of persons unlawfully entering."  6 U.S.C. § 211(c)(8); *see* 8 U.S.C. § 1103(a)(1).  DHS processes people who enter the country at ports of entry and arrests people who enter between ports.

Regardless of how they enter, people in the United States have a statutory right to seek protection from persecution in their home countries.  The main protection is asylum.  8 U.S.C. §

2

1158(a); *see also id.* § 1231(b)(3)(A) (withholding of removal); *id.* § 1231 note (protection under Convention Against Torture); *id.* § 1101(a)(27)(J).  People typically pursue asylum and other relief in removal proceedings before immigration judges.  8 U.S.C. § 1229a.  These proceedings are venued at immigration courts across the country.  8 C.F.R. §§ 1003.14(a), 1003.20(a).

CBP can release people from custody to pursue asylum and other relief while living in the United States with family or other sponsors.  8 U.S.C. § 1182(d)(5)(A).  CBP releases people "for urgent humanitarian reasons or significant public benefit," *id.*, for instance if there is a family with young children, or a migrant who has experienced unique trauma, or has serious medical needs.  Sandefur Decl., Ex. C ¶ 15.  Once released from custody, a person travels to the address they have given DHS, which is typically where their immigration proceedings are venued.  8 U.S.C. § 1229(a)(1)(F)(i).  DHS may also require people to report periodically to an ICE office near their address.  Harbury Decl., Ex. D ¶ 10.  Traveling to this address is therefore critical for a person to participate in immigration proceedings and to comply with any conditions of their release.  *See* 8 U.S.C. § 1229(a)(2)(A), (c) (immigration court notices sent to address).  If a person does not receive the notices that are sent to their address, they may be ordered removed in absentia.  *Id.* § 1229a(b)(5)(A).

**B.  Title 42 Policy.**

The executive order requires DPS officers to determine whether vehicle passengers were "subject to expulsion under the Title 42 order."  Executive Order GA-37, Ex. A § 1 ("EO").  This refers to the CDC's order, which was first issued in March 2020 and has been revised multiple times, which currently suspends the introduction of "noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter."  Ex. F at 23.

The Title 42 Order provides that it will be applied and enforced only by DHS personnel. *See id.* at 23. As its text makes clear, applying the Title 42 Order requires complex immigration-law determinations regarding whether a person has "proper travel documents," and whether their entry is "unlawful[]" or "contrary to law." *Id.*; *see Padilla v. Kentucky*, 559 U.S. 356, 379-80 (2010) (Alito, J., concurring) (describing complexities). CBP officers make these determinations using their knowledge of the many statutes and regulations that govern visas, entry, and inadmissibility, *see* 8 U.S.C. §§ 1101, 1225, 1227, 1182, 1187, and also using their access to dozens of federal databases with immigration-related information.

The various Title 42 Orders have contained a number of exceptions which have changed over time. They have included spouses and children of legal permanent residents, people with certain travel documents, people from countries that participate in the Visa Waiver Program, and unaccompanied children. Ex. F at 23; *see* 8 U.S.C. § 1187 (Visa Waiver Program). Applying these exceptions requires analyzing the legal status of people's spouses and children, the validity of travel documents, and whether a child has a "lawful immigration status," *id.* § 279(g)(2)(A). The Order further provides that DHS officers may, in their discretion, determine that a noncitizen "should be excepted from [the] Order based on the totality of the circumstances." Ex. F at 23.[1]

### C. Asylum Seekers in Texas.

When asylum seekers get released from custody, they go to a number of different places. Some go directly to join loved ones living in other parts of Texas, or in other States. Garcia Decl., Ex. B ¶ 12. Others stay temporarily at shelters near the border, which provide food, housing, COVID-19 testing, and other services, before arranging onward travel. *Id.* ¶ 4-6. A large network of such shelters has operated all along the border for decades. *Id.* ¶ 2.

---

[1] Plaintiffs do not concede the lawfulness of the Title 42 Order.

Thousands of asylum seekers live in Texas while they pursue their claims in immigration court.  *See* TRAC, Immigration Court Backlog, https://bit.ly/3imjb6r (showing 131,736 pending cases in Texas from El Salvador, Honduras, and Guatemala).  Children go to school, adults go to work.  *See* 8 C.F.R. § 247a.12(b)(6)(iv) (providing federal work authorization for asylum seekers after a waiting period).  Many asylum seekers live together with their families.  Espinosa Decl., Ex. E ¶ 3, 8, 9, 10.

Asylum seekers in Texas require group transportation for a host of different reasons.  Upon release, they take buses and taxis from CBP facilities to shelters, bus stations, and airports.  They take Greyhound and other long-distance buses to other parts of the State and country to join loved ones.  Shelter providers drive them to doctor's appointments, grocery stores, and countless other locations.  Those who are living in Texas use transportation for all the normal activities of daily life.  Groups of children take school buses or carpool.  Groups of workers commute on public buses and in carpools.  Families go to the store and visit friends.  Garcia Decl. ¶ 12, 14, 15, 25, 26; Sandefur Decl. ¶ 5-6; Harbury Decl. ¶ 10-14, 21, 24; Espinosa Decl. ¶ 12.

**D.  The Governor's Executive Order Banning Transport.**

Governor Abbott signed Executive Order GA-37 on July 28.  It provides that "effective immediately," no one in Texas other than law enforcement officials may "provide ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order."  EO § 1.  The order applies to almost every person CBP has decided to release.  It extends to individuals released years ago, prior to COVID-19, as long as they were "detained by CBP for crossing the border illegally."  The order cites health concerns and disagreements with federal immigration policy, including the Governor's belief that the people his order targets should not have been released by

5

CBP.   EO at 2 (citing "the admittance and movement of migrants under the Biden Administration"); *id.* at 1 (focusing on people CBP is "admitting into the United States").

For enforcement, the order directs the Texas Department of Public Safety ("DPS") to "stop any vehicle upon reasonable suspicion" of transporting migrants, and to "reroute such vehicle back to its point of origin or a port of entry."  EO § 2.  DPS officers can also impound any vehicle they believe is transporting migrants.  EO § 3.  And under Texas law, violations of an executive order issued during a state of disaster carry a fine of up to $1,000.  *See* State of Texas Emergency Management Plan: Basic Plan, at 9 (Feb. 2020), https://bit.ly/3rOkq1F.  These consequences do not require the driver to know that they were violating the order.

To apply the order, DPS officers must determine whether passengers were previously "detained by CBP for crossing the border illegally" and whether they "would have been subject to expulsion" under the Title 42 Order.  Title 42's application, in turn, depends on a person's immigration status and contains a number of exceptions based on both immigration status and CBP's discretion.

The transport executive order comes on the heels of a disaster declaration in which the Governor expressed his desire to part ways with federal immigration policy.  *See* Gov. Greg Abbott, Proclamation, 1-2 (May 31, 2021), Ex. G, https://bit.ly/3fvNLZP.  He described his initiative to deploy DPS officers to the Texas-Mexico border as being intended to "deter[] illegal border crossings," independent of the federal government.  *Id.*

One day after the transport executive order issued, Governor Abbott issued an executive order dramatically limiting localities' ability to engage in basic public-health efforts to combat COVID-19.  He explained, as justification, that "the path forward" for COVID-19 did not "rel[y]

on . . . government mandates." Press Release, Gov. Gregory Abbott (July 29, 2021), https://bit.ly/2VknwhV.

### E.  The Plaintiffs.

The Plaintiffs are shelters, non-profit organizations, and individuals who care for migrants and asylum seekers in Texas.  Plaintiffs transport migrants to and from their shelters, and to medical providers, supermarkets, bus stations, and airports.  The executive order would deeply harm their ability to carry on their work and daily lives, because it subjects them to arrest and impoundment, and is already chilling their movement.

Annunciation House is a non-profit organization that manages four shelters in El Paso. Garcia Decl. ¶ 2, 4.  These shelters house migrants while they arrange for onward travel to cities in Texas or other parts of the country.  *Id.* ¶ 4, 12.  When they arrive at the shelter, migrants are tested for COVID-19 and given food and basic medical care.  *Id.* ¶ 5, 16.  Annunciation House owns several vehicles that its volunteers use to transport groups of migrants to the El Paso airport, the Greyhound bus station, and medical appointments.  *Id.* ¶ 22-27.  The order threatens to shut down all of these activities.  *Id.* ¶ 29-32.  If it cannot transport migrants, the organization may have to cease operations.  *Id.*

Angry Tias and Abuelas of the Rio Grande Valley ("Angry Tias") is a grassroots organization that provides humanitarian aid to asylum seekers in the Rio Grande Valley. Sandefur Decl. ¶ 2.  It assists nearly 10,000 migrants every year.  *Id.* ¶ 4.  Angry Tias and a local taxi company it contracts with provide transport to asylum seekers, typically in groups, from shelters or hotels to doctor's appointments, bus stations, and airports.  *Id.* ¶ 7, 8-10.  The order has jeopardized the organization's ability to continue this work.  *Id.* ¶ 12-13.

Jennifer Harbury is a humanitarian who assists migrants travelling between McAllen and Brownsville.  Harbury Decl. ¶ 3.  She hosts migrants in her home until they receive federal work authorization.  *Id.* ¶ 8.  While they are staying with her, Ms. Harbury drives them to medical visits, appointments with lawyers, ICE check-ins, the supermarket, clothing stores, and church.  *Id.* ¶ 10-15.  She drives people in groups and individually in her personal car.  *Id.* ¶ 10, 27.  The order threatens her with detention, impoundment, and fines if she continues her work.  *Id.* ¶ 29.

FIEL Houston is an immigrant-led membership organization based in Houston.  Espinosa Decl. ¶ 1.  It has approximately 11,000 members, most of whom are undocumented or part of mixed-status families.  *Id.* ¶ 2.  Since the order was issued, FIEL members have expressed fears of racial profiling, unlawful detention, and other abuses by law enforcement officers charged with enforcing the order.  *Id.* ¶ 6, 11.  FIEL's members frequently travel in groups, buses, and carpools to work, medical appointments, and school drop-offs.  *Id.* ¶ 12.  The order has made them afraid to carry out these basic tasks, and some members have stopped driving altogether.  *Id.* ¶ 12-13.

**STANDARD OF REVIEW**

"A preliminary injunction should issue if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury . . . , (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006) (quotation marks omitted).

**ARGUMENT**

**I.      Plaintiffs Are Likely to Succeed on the Merits.**

The executive order is preempted for two primary reasons.  First, it contradicts federal admissions and release decisions, because it subjects immigrants to debilitating movement

restrictions despite the federal determination that they can live in the United States during their immigration proceedings.  Second, it conflicts with federal control over the immigration system, because it instructs state officials to make unilateral determinations of people's immigration status and unilateral immigration-related arrests.

The order also violates intergovernmental immunity.  States cannot thwart federal law by preventing private parties from helping carry out a federal regulatory scheme.  Yet the order would prevent Plaintiffs and other private NGOs and businesses from working with the federal government to ensure that immigrants are released into safe environments and able to get medical care and attend their immigration proceedings.

### A.  The Order Is Preempted.

For over a hundred years it has been clear that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government," not the States.  *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see Arizona v. United States*, 567 U.S. 387, 409 (2012) ("[T]he removal process is entrusted to the discretion of the federal government."); *id.* ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress.") (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)); *DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power.").

States are excluded from these decisions for multiple reasons.  "Decisions of this nature touch on foreign relations and must be made with one voice."  *Arizona*, 567 U.S. at 409; *see Hines v. Davidowitz*, 312 U.S. 52, 64 (1941) (explaining the "importan[ce] and delica[cy]" of protecting noncitizens' rights within the United States).  A State therefore may not "achieve its own immigration policy."  *Arizona*, 567 U.S. at 408.  The federal scheme allows States to assist federal officials in limited circumstances, and only in response to a "request, approval, or other instruction

from the Federal Government." *Id.* at 410; *see* 8 U.S.C. §§ 1103(a)(10), 1357(g), 1373(c) (allowing cooperation). But without federal direction, state officers are barred from taking "unilateral enforcement activity" or determining people's immigration history and status on their own. *City of El Cenizo v. Texas*, 890 F.3d 164, 179-80 (5th Cir. 2018). As a result, state officers generally do not receive federal "training in the enforcement of immigration law," which is necessary to apply the complex set of laws and policies that govern entry, detention, and release, *Arizona*, 567 U.S. at 408-09 (describing these "significant complexities").

The executive order flouts these bedrock principles entirely. It directs state officers to make stops and arrests based on their own unilateral determinations about people's immigration status—precisely what the Supreme Court and Fifth Circuit have held invalid. But it goes even further, because it targets the very immigrants whom the federal government has decided to release *so that* they can reside and move within the United States. The order is thus worse than unilateral; it is designed to actively *thwart* federal immigration decisions—a more extreme attack on federal supremacy than almost any previous attempt by a State to regulate migration.

1. The executive order's text makes clear that it is designed to contradict federal immigration decisions. Its explicit premise is that the Governor disagrees with the admission policies of "the Biden administration." EO at 1-2 (multiple statements to this effect). The order's transport ban and arrest mandate are triggered specifically by CBP's decision to release a person: They apply to the transport both of people "who have been detained by CBP" and then released, and of people to whom CBP could have but did not apply the "Title 42 order." EO § 1. The executive order thus targets people the federal government has permitted to remain in the United States during their immigration proceedings as they pursue congressionally authorized protection.

10

As Texas freely admits, the order "is chiefly concerned with migrants" whom CBP has "admitted into the country" with federal permission to "roam free."  Texas TRO Br. 5-6.

The order conflicts with CBP's admission and release decisions at every turn.  Despite CBP's decision to release people while they pursue asylum, the order directs state officers to reroute them back to their point of origin or to CBP stations at the border (or else to strand them on highways by impounding the vehicles), EO § 2, effectively vetoing CBP's decision that they can enter the United States.  Despite the federal system of immigration proceedings hinging on asylum seekers traveling to their U.S. address, *see* 8 U.S.C. § 1229(a)(1)(F)(i), the order prohibits those same people from obtaining transport to their addresses.  This effect on asylum seekers is particularly stark:  If they cannot get to their addresses in Texas and elsewhere, they cannot attend their hearings or receive a variety of notices about cases, *see id.* § 1229(a)(2)(A), (c), and could be removed in absentia, *id.* § 1229a(b)(5)(A).  If, for example, a mother and children were released near the border, with family in north Texas, they could not travel together to their destination, because under the order, bus companies, shelters, and volunteers could not drive them.  And, of course, many bus routes within border cities and from the border to other parts of Texas and other States regularly transport multiple migrant passengers.  The order would make it impossible for many asylum seekers to exercise their federal statutory right to seek protection.

Even more fundamentally, despite asylum seekers' express federal permission to live in the United States pending a decision in removal proceedings, the order targets them with "distinct, unusual and extraordinary burdens and obligations."  *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 65 (1941)).  Basic transport is essential for countless aspects of daily life, like getting to school, work, doctor visits, grocery stores, and court hearings.  Texas blithely asserts that such transport doesn't involve "groups,"

Texas TRO Br. 11, 12, but of course people do these things in groups all the time, especially families.  *See* Espinosa Decl. ¶ 12; Sandefur Decl. ¶ 7, 10; Harbury Decl. ¶ 10; Garcia Decl. ¶ 23. The Fifth Circuit and other courts have invalidated similar policies that sought to deny immigrants capabilities that are "essential for an individual to live and conduct daily affairs."  *Alabama*, 691 F.3d at 1293 (contracting); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 526, 528-29 (5th Cir. 2013) (housing rental); *Lozano v. City of Hazleton*, 724 F.3d 297, 315-16 (3d Cir. 2013) (same).  The executive order goes even further, because it imposes this "extraordinary burden[]" on the precise people the federal government wants living in the United States.  *Alabama*, 691 F.3d at 1293; *see Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (explaining that States cannot "impose discriminatory burdens upon the entrance and residence of aliens lawfully within the United States"); *Truax*, 239 U.S. at 39, 42 (once a person is "admitted" by the federal government, States cannot prevent them from "entering and abiding in any state in the Union").  It plainly conflicts with DHS's release decisions for the Governor to decree that the people DHS releases cannot be transported to join loved ones, go to immigration court, check in with ICE, or even obtain food, shelter, testing, or medical care.

2. Even if the order did not contradict federal release decisions, it authorizes the exact kind of unilateral state immigration decisions that the Fifth Circuit and Supreme Court have held invalid.  In *Farmers Branch*, the Fifth Circuit struck down a provision that allowed state officials "to assess the legality of a non-citizen's presence."  726 F.3d at 536.[2]  And in *Arizona*, the Supreme

---

[2] Judge Higginson's lead opinion in *Farmers Branch* is controlling and constitutes binding precedent.  That opinion was the narrowest ground on which the Court reached its conclusion— the "common denominator" for the 9 of 15 judges who concluded the ordinance was preempted. *United States v. Eckford*, 910 F.2d 216, 219 n.8 (5th Cir. 1990); *see also Farmers Branch*, 726 F.3d at 543-44 (Dennis, J., specially concurring) (calling it "the lead opinion").  The Fifth Circuit has subsequently treated Judge Higginson's opinion as controlling precedent.  *See El Cenizo*, 890 F.3d at 188 (opinion authored and joined by judges who dissented in *Farmers Branch*).

Court held that state officers could not make immigration-related arrests "absent any request, approval, or other instruction from the Federal Government."  567 U.S. at 410.  It is thus crystal clear that state officials cannot make "unilateral" immigration-status determinations or arrests. *El Cenizo*, 890 F.3d at 179.  As both Courts have explained, "[t]here are significant complexities involved in enforcing federal immigration law, including the determination of whether a person is removable." *Arizona*, 567 U.S. at 409; *see Farmers Branch*, 726 F.3d at 536.  Allowing States to act based on their own perceptions of people's status would "open[] the door to conflicting state and federal rulings," *id.*, and would subject immigrants to "unnecessary harassment" by untrained state officers operating outside the federal scheme, *id.* at 534.

The executive order is indefensible in light of this principle.  It instructs state officers to unilaterally decide whether people's immigration status makes them "subject to expulsion" under Title 42, EO § 1—an inquiry that raises multiple complex status questions, *see supra* Background Part B—even though "*Arizona* denied state officers the power to unilaterally make removability determinations," *El Cenizo*, 890 F.3d at 188.  The order instructs officers to guess at whether passengers in a car were previously arrested by CBP, and whether their entry was "illegal[]."  EO § 1.  The order then directs officers to detain the migrants and their driver based on these unilateral determinations of immigration history and status, and force them to drive to the border or their point of origin.  It is hard to imagine a clearer example of "unilateral enforcement activity." *El Cenizo*, 890 F.3d at 180.

Texas claims that the order "does not turn on 'immigration status,'" because it is "a public-health measure." Texas TRO Br. 13-17.  But that obscures its clear operation.  The order explicitly requires DPS officers to stop and impound based on whether a person is "subject to expulsion under the Title 42 order," and whether their entry was "illegal[]."  EO § 1.  Those determinations

are required every single time the order is enforced.  And as explained, those determinations cannot be made without making the multiple immigration-status determinations that trigger Title 42 and its exceptions, including the validity of a person's travel documents, their visa status, the citizenship and immigration status of their relatives, and the legality of their entry more generally. *See supra* Background Part B.  Unilateral immigration determinations are thus a necessary feature of the executive order, in all of its applications.  And even Texas does not dispute that such determinations are preempted.

Not only are state officers prohibited from applying these categories, the categories themselves are preempted because they have no basis in federal immigration law.  The order applies to people who "*would have* been subject to" Title 42, and people "who have been detained by CBP for crossing the border illegally."  Neither of these is a classification or status under federal immigration law, and neither is implicit in any status a person might currently have.  States are preempted from attaching consequences to an immigration "classification that does not exist in federal law."  *Farmers Branch*, 726 F.3d at 534, 532.

By directing state officers to make these determinations themselves, the order is certain to cause the very "unnecessary harassment" that led the Supreme Court to prohibit unilateral immigration activity by state officers.  *Arizona*, 567 U.S. at 408.  There is no readily ascertainable way to make the complex immigration determinations required to enforce the executive order— particularly for DPS officers, who have no training in immigration law or the complex mechanics of Title 42 and its exceptions.  How will a DPS officer develop "reasonable suspicion" that the people in a vehicle were released by CBP, or that they were subject to Title 42 but not its exceptions?  Without immigration training or information, what are officers supposed to rely on other than their own perceptions of who "looks" like they recently crossed the border?  And how

are taxi or bus drivers to know when people they pick up are subject to the order, such that they might face fines, impoundment, and re-routing?  The order would put Texans in real danger of arbitrary stops and questioning, especially in border communities.  "This is not the system Congress created."  *Id.*

3.  Finally, the order is independently preempted for its stark mismatch with federal laws governing the harboring and transportation of undocumented immigrants.  The federal harboring statute already penalizes a person who "transports" an "alien within the United States" where the person has knowledge or "reckless disregard of the fact that the alien has come to, entered, or remains in the United States in violation of law," and where the transport furthers the violation.  8 U.S.C. § 1324(a)(1)(A)(ii); *id.* § 1324(a)(1)(A)(iii) (similar).  The federal statute thus requires both knowledge (or reckless disregard) of the violation and that the transport assist in the violation.

The executive order imposes a far broader prohibition, because it contains no scienter requirement of any kind, and it does not require the transportation to further any legal violation.  To the contrary, as explained, it prohibits transportation even of those with explicit federal permission to reside in the United States (because in Texas's view that permission should not have been granted).  The consequences of this expansion are stark.  A taxi driver could lose their car if they pick up people who were released by CBP.  A bus driver could be rerouted hundreds of miles away because of the status of their passengers.  These drivers obviously have no way of knowing their passengers' immigration status, much less capacity to assess the relevant technical legal questions.  But that would not protect them from the order's expansive punishments.

The Governor's attempt to expand federal harboring law is illegal under *Farmers Branch*.  There, the Fifth Circuit invalidated an ordinance that overlapped with federal harboring law precisely because the ordinance lacked a scienter or furtherance element.  726 F.3d at 530; *see id.*

15

at 531 (ordinance invalid because it "criminaliz[ed] conduct that does not have the effect of evading federal detection").  The exact same is true of the executive order.  By punishing transportation that does not "facilitat[e] evasion from federal authorities," the executive order "interfere[s] with federal anti-harboring law" and is "an untenable expansion of the federal harboring provision."  *Id.* at 529 & n.9 (collecting cases).

To justify these many blatant conflicts with federal law, the order claims to be motivated by public health concerns.  But it does not explain how stranding people at the border will protect public health, and in practice the order would prevent people from accessing COVID-19 testing and medical care.  *See* Garcia Decl. ¶ 16-17; Harbury Decl. ¶ 10, 20; US TRO Br. 2; TRO Reply 1, 13.  The order also comes after Governor Abbott's repeated denunciations of the Biden administration's immigration policy (absent COVID concerns) and his promises to "deter" migration on his own.  The same week he issued this order, the Governor barred Texas businesses and local governments from requiring masks, social distancing, or vaccines.  *See* Executive Order GA-38 (July 29, 2021), Ex. H.  And the order does not account for the many ways in which migrants are tested for COVID-19 upon release from custody, including by Plaintiffs.  Texas does not mention whether it is taking any similar precautions for the people it releases from custody.  And in March, the Governor *rejected* a federal offer to fund COVID-19 testing for migrants.[3]

Even if public health was the order's sole motivation, that would not allow the Governor to overrule the federal government's decisions about how to manage the immigration system or enforce federal law.  *Every* invalid attempt by States to regulate immigration has cited concerns

---

[3] *See* Priscilla Alvarez, *Texas Gov. Abbott Stalled Federal Offer to Test Migrants Then Blamed Them for Spreading COVID*, CNN, Mar. 5, 2021, https://cnn.it/2TSExPt; Todd J. Gillman, *As Abbott Hits Biden for Releasing Migrants with COVID, White House Asks Why Texas Rejects Funds to Test Them*, Dallas Morning News, Mar. 11, 2021, https://bit.ly/2Vswrxu.

for things like public health and public safety. *See, e.g., Arizona*, 567 U.S. at 398 (safety and environmental concerns); *Truax*, 239 U.S. at 41 (health and safety). But those concerns have never allowed States to enact policies that conflict with federal law.

### B. The Order Violates Intergovernmental Immunity.

States cannot "retard, impede, burden, or in any manner control, the operations of the" federal government. *McCulloch v. Maryland*, 4 Wheat. 316, 436 (1819). This principle, known as intergovernmental immunity, protects both "the Federal Government and those with whom it deals"—suppliers, lessees, service providers—from state laws that interfere with federal operations. *North Dakota v. United States*, 495 U.S. 423 (1990) (plurality); *id.* at 444 (Scalia, J., concurring) ("All agree in this case that state taxes or regulations that discriminate against the Federal Government or those with whom it deals are invalid . . . ."). Intergovernmental immunity protects private parties who work with the federal government, because "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *North Dakota*, 495 U.S. at 438.

The executive order is a straightforward violation of this principle. The federal government relies on Plaintiffs and other private entities to transport immigrants to get COVID-19 testing, to seek medical care, to show up for ICE check-ins, to get to immigration court, and to join family in other parts of the country where venue in their removal proceedings has been transferred. *See* Garcia Decl. ¶ 12, 16-17; Harbury Decl. ¶ 10-14; Sandefur Decl. ¶ 8; 8 U.S.C. §§ 1229(a)(1)(F)(i), (a)(2)(A), (c). Such private parties are an integral part of the federal immigration scheme, particularly its systems for parole, admission, and removal proceedings. *See* U.S. Br. 16-19, *US v. Texas*; Hastings Decl., *US v. Texas*, ECF 3-1 ¶ 9, 13, 24, 25. Yet the executive order exposes these same parties to fines, impoundment, and other consequences for doing exactly what the

federal government has asked.  The order does not impose any kind of generally applicable rule, but specifically targets the federal government and those assisting it.  *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 259 (1956) (invalidating state policy that restricted federal "Government servants . . . in their specific attempt to obey orders").

Texas suggests that only federal contractors are protected by intergovernmental immunity, and that the State is free to prevent anyone else from working with the federal government.  Texas TRO Br. 22.  But it cites no cases adopting that rule, which would clash with the immunity doctrine's basic purpose of preventing state interference with federal programs.  When a State targets "one who deals with the Government" and prevents them from assisting, *North Dakota*, 495 U.S. at 438, the burden imposed on federal operations does not depend on whether the service provider is "bound by contract," Texas TRO Br. 22.  In either case, the State is obstructing the federal scheme and preventing the federal government from working with its chosen providers.  *See North Dakota*, 495 U.S. at 441 (states may "not restrict the parties from whom the Government may purchase" goods and services); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842-43 (9th Cir. 2014) ("When the state law is discriminatory, a private entity with which the federal government deals can assert immunity.").  Texas provides no basis for its arbitrary distinction among those who help carry out the federal immigration scheme.  As the United States has explained, its immigration operations "*hinge* on [its] ability to use" non-governmental entities like Plaintiffs "to transport noncitizens."  U.S. TRO Reply 1 (emphasis added).

## II.     Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

The executive order, if implemented, will cause enormous and immediate harm to thousands of people in Texas.  *See Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).  It would have a catastrophic impact on migrant transport at the southern

border, halt the operations of countless service providers, and upend the daily lives of asylum seekers and other immigrants living in Texas.

Service providers will be put in an impossible position. Shelters like Plaintiff Annunciation House could be forced to close, even though they have been working with the federal government to care for thousands of migrants for decades. Garcia Decl. ¶ 2, 30-32. All of the Plaintiffs would be forced to choose between halting much of their humanitarian work—which is necessary to provide shelter, food, and medical care to families fleeing persecution—or submitting to the order's harsh penalties. *Id.* ¶ 29; Sandefur Decl. ¶ 12; Harbury Decl. ¶ 27-29. Plaintiffs and others throughout Texas will also face an arbitrary regime of stops by state officers guessing at the immigration status of their passengers. Espinosa Decl. ¶ 11-13. And the border communities where most Plaintiffs live face dramatic new challenges as migrants become unable to move to other parts of Texas and other States. Garcia Decl. ¶ 30; Sandefur Decl. ¶ 13; Harbury Decl. ¶ 26.

Plaintiffs' clients and other asylum seekers will face further severe harms. They could no longer travel as a "group," including even as a family. Many will be unable to travel to get COVID-19 testing and medical care. Garcia Decl. ¶ 16, 25; Harbury Decl. ¶ 10, 20. Groups of children taking buses to school, and groups of workers carpooling to work will face detention and rerouting. Espinosa Decl. 12. Asylum seekers will not be able to find transport to join their loved ones in other parts of Texas or the country; many will miss court dates and ICE check-ins. Harbury Decl. ¶ 21; Garcia Decl. ¶ 12-14. This is an unprecedented attempt to destroy the lives of these migrants, who have a federal right to seek asylum and federal permission to reside in the United States.

These devastating consequences have already begun, because the order by its terms was "effective immediately," and so people throughout the State were quickly chilled from driving and

leaving their homes.  Espinosa Decl. ¶ 12; Sandefur Decl. ¶ 12.  But the consequences could soon get worse, because absent an injunction, Texas says it plans to start enforcing the order in a week.

### III.    The Balance of Equities and Public Interest Favor an Injunction.

Texas would not be harmed by an injunction.  The executive order's stated purpose is to reduce the spread of COVID-19 in Texas.  But its likely effect is precisely the opposite, as the Court has explained.  TRO Order 2 (order would "exacerbat[e] the spread of COVID-19").  By preventing shelters and family members from driving people to get COVID-19 tests and vaccines, the order would *harm* efforts to detect and prevent the disease.  Its main effect would be to force migrants to stay in border towns and shelters, unable to find transportation elsewhere.

The order also extends far beyond any conceivable connection to COVID-19, because it bars transporting *anyone* CBP has arrested and released, including people who entered the country before the pandemic.  Its broad language would even apply to legal permanent residents and DACA recipients who were once "detained by CBP for crossing the border illegally."  EO § 1.  The order's vastly overbroad scope will do nothing to further its aims.

The balance of harms thus tips sharply against Texas.  And the public interest would not be served by stranding large numbers of people in border communities away from their families.

### CONCLUSION

The Court should enjoin the executive order in its entirety.

Dated: August 4, 2021

Respectfully submitted,

/s/ Adriana Pinon

Kathryn Huddleston*
Adriana Pinon, TX Bar No. 24089768
Bernardo Rafael Cruz*
Brantley Shaw Drake*
Andre Segura*
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
apinon@aclutx.org
khuddleston@aclutx.org
brcruz@aclutx.org
sdrake@aclutx.org
asegura@aclutx.org

Spencer Amdur*
Katrina Eiland*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
samdur@aclu.org
keiland@aclu.org
cwofsy@aclu.org

Omar Jadwat*
Noor Zafar*
Ming Cheung*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org
mcheung@aclu.org

*Attorneys for Plaintiffs*

*\*Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on August, 4, 2021, this motion was filed simultaneously with the complaint in this action. This motion and all accompanying exhibits, along with copies of the summons and complaint, will be served on each Defendant.

*/s/ Adriana Pinon*
Adriana Pinon, TX Bar No. 24089768
August 4, 2021
