**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; FIEL HOUSTON, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 3:21-cv-00178-KC |
| GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY, | § § § § § § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

Table of Contents ..................................................................................................................... ii

Table of Authorities ................................................................................................................ ii

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 2

Preliminary Injunction Standard ............................................................................................. 7

Argument ................................................................................................................................. 8

    I.    Plaintiffs Have Failed to Show Standing. .................................................................. 8

        A.   Plaintiffs Bear the Burden of Establishing Article III Standing ..................................... 8

        B.   Plaintiffs Alleged Harms are Not—and Were Not—Certainly Impending. ................... 9

        C.   Alleged Harms Are Neither Traceable nor Redressable. ............................................. 10

    II.   Plaintiffs' Constitutional Claims Are Barred by Sovereign Immunity. ............................ 11

        A.   Not Every State Official Falls under the *Ex parte Young* Exception ............................ 11

        B.   *Ex parte Young* Does Not Apply to Governor Abbott in This Case .............................. 12

        C.   *Ex parte Young* Does Not Apply to Director McCraw in This Case ............................. 13

    III.  Plaintiffs Face No Irreparable Harm. ...................................................................... 13

    IV.  Plaintiffs Are Not Likely to Succeed on the Merits. ................................................. 14

        A.   Federal Law Does Not Preempt GA-37 ....................................................................... 14

        B.   GA-37 Does Not Infringe on Intergovernmental Immunity. ...................................... 23

    V.   The Equities and Public Interest Foreclose a TRO Here .................................................. 25

    VI.  The First-Filed Rule Prevents the Entry of Injunctive Relief. .......................................... 26

Conclusion ............................................................................................................................. 26

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*6th St. Bus. Partners LLC v. Abbott*,
  1:20-cv-706-RP, 2020 WL 4274589 (W.D. Tex. July 24, 2020) .............................................20

*In re Abbott*,
  956 F.3d 696 (5th Cir. 2020), *vac'd as moot*, 141 S. Ct. 1261 (2021) ...................................20

*Altria Group, Inc. v. Good*,
  555 U.S. 70 (2008)..................................................................................................................22

*Anderson v. Edwards*,
  514 U.S. 143 (1995)...........................................................................................................22, 23

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................................................................26

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) .................................................................................................16

*Blackburn v. United States*,
  *100 F.3d 1426. 1435 (9th cir. 1996)* .....................................................................................31

*Boeing Corp. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ...........................................................................................31, 32

*Cadle Co. v. Whataburger of Alice, Inc.*,
  174 F.3d 599 (5th Cir. 1999) .................................................................................................33

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .................................................................................................14

*Chacon v. Granata*,
  515 F.2d 922 (5th Cir. 1975) .................................................................................................21

*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019) .................................................................................18, 19, 20, 21

*City of El Cenizo, Tex. v. Texas*,
  890 F.3d 164 (5th Cir. 2018) .............................................................................................23, 27

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...........................................................................................................17, 18

*Clark v. Edwards*,
    468 F. Supp. 3d 725 (M.D. La. 2020)..................................................................17, 23

*DeCanas v. Bica*,
    424 U.S. 351 (1976).......................................................................................................26

*El Paso County, Tex. v. Trump*,
    982 F.3d 332, 337 (5th Cir. 2020) ............................................................................9

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)......................................................................................................16

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824)................................................................25, 26, 28

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11 (1905).....................................................................................................8, 33

*La. Envt'l Soc., Inc. v. Coleman*,
    524 F.2d 930 (5th Cir. 1975) ...................................................................................22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................16

*Mayor, Aldermen & Commonalty of City of New York v. Miln*,
    36 U.S. (11 Pet.) 102 (1837)..............................................................25, 26, 27

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) (per curiam) ........................................................................14

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)......................................................................................................22

*Mi Familia Vota v. Abbott*,
    834 F. App'x 860 (5th Cir. 2020) (per curiam) ............................................32

*Mi Familia Vota v. Abbott*,
    977 F.3d 461 (5th Cir. 2020) ...................................................................................20

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ...................................................................................15

*Morris v. Livingston*,
    739 F.3d 740 (5th Cir. 2014) .........................................................................19, 20

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018)................................................................................................27

iv

*Nichols v. Alcatel USA, Inc.*,
    532 F.3d 364 (5th Cir. 2008) ...............................................................................15, 21

*North Dakota v. United States*,
    495 U.S. 423 (1990)...............................................................................................30, 31

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) (en banc) .................................................................18

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ..........................................................................23, 24

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947).................................................................................................22

*Save Power Ltd. v. Syntek Fin. Corp.*,
    121 F.3d 947 (5th Cir. 1997) ..................................................................................33

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ...............................................................................21

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).....................................................................................................16

*Stringer v. Whitley*,
    942 F.3d 715 (5th Cir. 2019) ..................................................................................17

*Sutter Corp. v. P & P Indus., Inc.*,
    125 F.3d 914 (5th Cir. 1997) ..................................................................................33

*Tex. All. for Retired Americans v. Hughes*,
    976 F.3d 564 (5th Cir. 2020) (per curiam)...........................................................32

*Tex. Democratic Party v. Abbott*,
    --- F.3d ----, No. 20-50407, 2020 WL 5422917 (5th Cir. Sept. 10, 2020)
    (Stewart, J., concurring)..........................................................................................14

*Texas v. Biden*,
    No. 2:21-cv-67 (N.D. Tex.) (MPP).........................................................................10

*Texas v. Biden*,
    No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021).....................28, 29, 30, 33

*Texas v. United States*,
    No. 6:21-cv-16 (S.D. Tex.) ......................................................................................10

*Texas v. United States*,
    No. 6:21-cv-3 (S.D. Tex.) ........................................................................................10

v

*" McCarthy ex rel. Travis v. Hawkins*,
    381 F.3d 407 (5th Cir. 2004) ...................................................................................18

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) .............................................................................30, 31

*United States v Texas*,
    EP-21-CV-173-KC (W.D. Tex. Aug. 13, 2021) ...............................................17, 21

*United States v. Texas*,
    EP-21-CV-173-KC (W.D. Tex. Aug. 3, 2021) .........................................14, 17, 21

*Va. Office for Prot. & Advocacy v. Stewart*,
    563 U.S. 247 (2011)................................................................................................19

*Villas at Parkside Partners v. City of Farmers Branch*,
    726 F.3d 524 (5th Cir. 2013) (en banc) .................................................................27

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) .................................................................................15

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA,
    AFL-CIO*,
    751 F.2d 721 (5th Cir. 1985) .................................................................................34

*Washington v. United States*,
    460 U.S. 536 (1983)................................................................................................31

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .................................................................................15

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..........................................................................................22, 24

*Ex parte Young*,
    209 U.S. 123 (1908)..............................................................................18, 19, 20, 21

**Statutes**

8 U.S.C. § 1182(a)(1)(A)(i) ..........................................................................................29

8 U.S.C. § 1222(a) ...................................................................................................28, 29

42 U.S.C. § 265............................................................................................................28

Tex. Code Crim. Proc. § 2.251(b)................................................................................20

TEX. GOV'T. CODE §§ 418.012, 418.016, 418.018(c)....................................................19

U.S. Code Title 42 "The Public Health and Welfare" Section ....................................13, 25, 28, 33

**Other Authorities**

8 C.F.R. § 232.3 ...........................................................................................................................29

86 Fed Reg 38717 ........................................................................................................................28

U.S. Const. art. VI, cl. 2................................................................................................................30

## INTRODUCTION

Plaintiffs filed a complaint in search of a controversy. When this case began, Defendants were not enforcing the challenged executive order, had publicly announced that they were not enforcing it, and were enjoined from enforcing it. And yet, Plaintiffs seek to "enjoin Defendants from enforcing" the executive order. ECF 1 at 21. Entering such an injunction now serves no purpose. Plaintiffs lack standing, and their motion for preliminary injunction should be denied.

On the merits, Plaintiffs cannot succeed. The transportation of unvaccinated and COVID-positive migrants in Texas is worsening the pandemic. With the rapid spread of the Delta variant and the surge of migrants crossing Texas' southern border, someone had to act, but the Biden Administration's policies have made things worse, not better.

In these circumstances, Texas was not required to sit on its hands: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905). Drawing on this core police power, Governor Abbott issued Executive Order GA-37 to quell the "potentially catastrophic effect on public health in Texas" caused by the confluence of the migrant crisis and the pandemic. Ex. 1 at 1. GA-37 precludes (with exceptions) providing transportation to groups of migrants who pose a danger of transmitting COVID-19 into Texas communities.

Plaintiffs' claims cannot succeed. First, as private entities who do not work for, or on behalf of, the federal government, they cannot show that GA-37 is preempted as to them. No federal statute grants them a right to be free of GA-37's public-health regulations. Second, as even the federal government acknowledges, intergovernmental does not extend to private volunteers like Plaintiffs.

1

**BACKGROUND**

On March 4, 2020, the Texas Department of State Health Services reported the first instance of a Texas resident testing positive for COVID-19. *See DSHS Announces First Case of COVID-19 in Texas,* Tex. Health & Hum. Servs (Mar. 4, 2020), https://www.dshs.texas.gov/news/releases/2020/20200304.aspx (last visited Aug. 1, 2021). Since then, more than 2.6 million Texans have contracted COVID, leading to over 53,000 deaths statewide. *See COVID-19 in Texas Dashboard*, Tex. Health & Hum. Servs, https://txdshs.maps.arcgis.com/apps/dashboards/ed483ecd702b4298ab01e8b9cafc8b83 (last visited Aug. 20, 2021).

The COVID-19 crisis has presented an unprecedented challenge to public health and has caused devastating economic damage and societal disruption. As the world has learned, COVID-19 is highly contagious. *See Clinical Questions about COVID-19: Questions and Answers*, Centers for Disease Control,   https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission (last visited Aug. 1, 2021). It can often be spread by infected individuals who exhibit little to no visible symptoms. *See* Rahul Subramanian, et al., *Quantifying Asymptomatic Infection and Transmission of COVID-19 in New York City Using Observed Cases, Serology, and Testing Capacity,* available at https://www.pnas.org/content/118/9/e2019716118 (last visited Aug. 1, 2021). And it has an incubation period that ranges from two to fourteen days. *See Clinical Questions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission. In response, governments across the world have curtailed international travel and imposed significant restrictions on the movement of people within and across their borders. *See* COVID-19 Country Specific Information, available at https://travel.state.gov/content/travel/en/traveladvisories/COVID-19-Country-Specific-Information.html.

Across the world, that is, save our southern border. In the six months since he has taken office, President Biden's immigration policy has created a humanitarian crisis at the border by

systematically dismantling key border controls and immigration protections. Critical immigration programs such as the highly successful Migrant Protection Protocols (MPP) were unlawfully discarded. *See* June 1, 2021 Memorandum from Alejandro N. Mayorkas, available at https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf (last visited Aug. 1, 2021). The Administration has also issued multiple unlawful orders seeking to pause most congressionally mandated removals of aliens, and prioritization of immigration enforcement actions that has resulted in a failure to take custody of aliens convicted of crimes of moral turpitude and drug offenses as mandated by Congress. Texas has challenged each of these open-border actions as unlawful. And federal courts have ruled against the Biden Administration in each case, save one that remains pending. *See Texas v. United States*, No. 6:21-CV-00016, 2021 WL 3683913, at *42–57 (S.Aug. 19, 2021) (enforcement guidelines); *Texas v. Biden*, No. 2:21-CV-067-Z, --- F.3d ---, ---, 2021 WL 3603341, at *18–23 (N.D. Tex. Aug. 13, 2021) (MPP); *United States*, No. 6:21-CV-00003, --- F.Supp.3d ---, ---, 2021 WL 2096669, at *38–47 (S.D. Tex. Feb. 23, 2021) (100-day pause on removals); *see also Texas v. Biden*, No. 4:21-cv-00579, (N.D. Tex.) (Title 42 compliance).

The result of these policies has been a devastating (and entirely predictable) explosion of illegal immigration, human trafficking, and criminal acts against migrants. DHS Secretary Mayorkas himself admitted the federal government is "on pace to encounter more individuals on the southwest border than we have in the last 20 years." March 16, 2021, Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border, available at https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandron-mayorkas-regarding-situation. And the Office of Refugee Settlement in the U.S. Department of Health and Human Services reports that, through June 30, 2021, unaccompanied

children are being released to sponsors at a rate of 950 per month *in Texas alone* for this fiscal year (FY 2021), up from 195 per month in Texas for FY 2020. *See Unaccompanied Children Released to Sponsors by State*, available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state. DHS's own data shows that total encounters with aliens at the southwest border have increased from 74,019 in December 2020 to 212,672 in July 2021. *See* Southwest Land Border Encounters, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

The migrant crisis and the COVID-19's pandemic have converged in Texas to exact disastrous consequences, particularly along Texas's one-thousand-mile border with Mexico. The unprecedented surge of migrants crossing into Texas from foreign countries has exacerbated the risk of community spread of COVID. Many migrants come from countries with far lower vaccination rates than the United States. *See* Josh Holder, *Tracking Coronavirus Vaccinations Around the World*, N.Y. Times (July, 31 2021), https://www.nytimes.com/interactive/2021/world/covid-vaccinations-tracker.html (reflecting that Mexico, El Salvador, Guatemala, Honduras, Nicaragua, Costa Rica, Ecuador, Belize, and Panama all have significantly lower COVID vaccination rates than the United States). And the journey itself often entails crowded, unsanitary conditions that leave migrants vulnerable to exposure to the virus. The CDC recommends that in such instances, individuals undergo a 14-day quarantine to mitigate the risk of further transmission. *See Quarantine and Isolation,* Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last visited Aug. 23, 2021). Experience has shown, however, that migrants who have evaded or been released from federal custody do not follow these procedures before entering the State's interior.

The numbers speak for themselves. For the four-month period from March through June

2021, Customs and Border Patrol data shows over 721,000 attempted entries along the Southwest border. *See* Southwest Land Border Encounters, available at https://www.cbp.gov/news room/stats/southwest-land-border-encounters (last visited Aug. 1, 2021). Thus, in a four-month period, the number of attempted migrant entries has exceeded the entire population of Detroit, Michigan. *See Largest Cities in the United States by Population*, https://ballotpedia.org/Largest_cities_in_the_United_States_by_population (last visited August 22, 2021). In the Rio Grande Valley alone, 330,000 migrants have been recorded in the last 10 months, up 478% from the same time last year. Morrison, *Surge Raises Suspicions Migrants are Propelling COVID-19 Outbreaks*, Yahoo News (July 29, 2021, 1:59 PM), https://news.yahoo.com/surge-raises-suspicions-migrants-propelling-185900170.html. And reports have indicated Customs and Border Patrol observed a 900% increase in the number of migrant detainees who tested positive for COVID-19. *See* Griff Jenkins & Adam Shaw, *COVID Cases Among Migrants in Rio Grande Valley Sector Surge 900% as Border Numbers Continue to Rise*, Fox News (July 20, 2021), https://www.foxnews.com/politics/covid-cases-migrants-rio-grande-valley-sector-border-numbers.

Against this grim backdrop, and to address the serious threat to public health posed by these two crises, Governor Abbott issued Executive Order GA-37. Ex. 1; *see also* Ex. 4. The Executive Order is chiefly concerned with migrants who are "admitted" into the country with COVID-19 and who are permitted to roam free throughout the State, unwittingly contributing to the spread of virus. Subject to exceptions, it precludes the transportation of migrants who "have been detained by CBP for crossing the border illegally or . . . would have been subject to expulsion under the Title 42 order." *Id.* Additionally, it authorizes law enforcement to re-route migrants back to their port of entry or point of origin. *Id.* GA-37 is limited to intra-state movement by its own terms. *Id*.

5

Following the issuance of the Governor's order, DPS began working on policies governing how to enforce GA-37. Ex. 5 ¶ 15. Developing enforcement policies is a time-consuming, collaborative process that requires coordination with other state and federal entities, as well as other stakeholder, such as charity groups. *Id.* ¶¶ 11, 15–17. As part of its efforts to develop those policies, DPS consulted with the head of CBP (Raul Ortiz) on July 29, 2021, and a non-profit group that had been transporting migrants the next day. *Id.* ¶¶ 18–19. DPS sought to work with other interested parties wherever possible to develop enforcement guidelines. *Id.* ¶ 11. DPS considers federal immigration authorities to be "partners, not adversaries." *Id.* ¶ 19.

On July 29, 2021, Attorney General Garland wrote Governor Abbott a letter demanding that he rescind GA-37. *See* Ex. 2. That letter expressed myriad concerns about GA-37. *Id.* at 2. Though the Attorney General expressed a desire to confer with Texas in an effort to avoid a lawsuit (citing the Justice Manual), the DOJ called the clerk's office the same day to warn the Court that a TRO filing was imminent. The next day, Governor Abbott responded to the Attorney General. He proposed "several actions" that Biden Administration could take to "avert a constitutional showdown" and "address[] the public health concerns that [his] Executive Order seeks to achieve." Ex. 3 at 2. Instead, DOJ provided notice that DOJ intended to seek a TRO that day—without further consultation with Texas or Governor Abbott, and without GA-37 having been enforced once.

This Court scheduled an emergency hearing in *United States v. Texas* on August 2, 2021. The Court issued a TRO the following day, enjoining the State's enforcement of GA-37. The TRO was to remain in force until the Court had the opportunity to hear arguments regarding the United States' motion for preliminary injunction on August 13, 2021. The Court held the second hearing as scheduled, where it extended the restraining order for an additional fourteen days. The

restraining order has since remained in effect and will not expire until August 27, 2021.

It is in the midst of these proceedings, after the Court's TRO took effect, that Plaintiffs filed both their complaint and their motion for preliminary injunction. Defendants file this response.

### PRELIMINARY INJUNCTION STANDARD

Before the Court may issue a preliminary injunction, the plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) substantial threat of an irreparable injury absent the injunction; (3) that the threatened harm absent the injunction outweighs the harm to the non-moving party by granting the injunction; and (4) "that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quoting *Concerned Women for Am. Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989)). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). That burden is heavy and requires "*a clear showing.*" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

The Fifth Circuit "has repeatedly cautioned that a preliminary injunction is an *extraordinary remedy* which should not be granted unless the party seeking it has *clearly carried the burden of persuasion on all four requirements.*" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2013)) (internal quotation marks omitted)) (emphasis added). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). Even when a movant satisfies each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line*

*Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The decision to grant a preliminary injunction is to be treated as an exception rather than the rule. *Id*.

## ARGUMENT

The claims raised by Plaintiffs in their complaint and motion for preliminary injunction fail due lack of jurisdiction. First, Plaintiffs lack standing. Second, sovereign immunity bars their claims

Even if the Court had jurisdiction, injunctive relief would remain improper. Plaintiffs have not "clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (quotation omitted). First, Plaintiffs face no imminent irreparable harm that could justify extraordinary relief. Not only is enforcement of the executive order already enjoined, but DPS has not developed the necessary policies to guide enforcement. *See* Ex. 5 ¶ 16. Second, Plaintiffs are unlikely to prevail on the merits. GA-37 is a lawful exercise of the State's power to protect public health, neither preventing the federal government from enforcing federal immigration law nor discriminating against the federal government. Finally, the equities and public interest counsel against restraining a sovereign State from implementing an important public-health protection during a pandemic. The Court should therefore deny their motion for a preliminary injunction.

## I.      Plaintiffs Have Failed to Show Standing.

None of the Plaintiffs have made a clear showing that they have the necessary standing to maintain a preliminary injunction.

### A.      Plaintiffs Bear the Burden of Establishing Article III Standing.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed at all in any cause*." Steel Co. v.*

8

*Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) (quotation omitted) (emphasis added). "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"— "with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

At the preliminary injunction stage, this means plaintiffs must make a "clear showing" that they have standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Specifically, the plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *El Paso County, Tex. v. Trump*, 982 F.3d 332, 337 (5th Cir. 2020).

Because Plaintiffs are "invoking federal jurisdiction," they "bear[] the burden of establishing these elements" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

**B.      Plaintiffs Alleged Harms Are Not—and Were Not—Certainly Impending.**

When Plaintiffs filed both their complaint and their motion for preliminary injunction, they did not face an imminent threat that GA-37 would be enforced against them. By that time, Texas had publicly announced that it had not enforced GA-37 and that enforcement would not begin until after forthcoming action by the Department of Public Safety. Ex. 5 ¶ 15. Moreover, this Court had already enjoined the State's enforcement of GA-37. *See* Temporary Restraining Order, *United States v. Texas,* EP-21-CV-173-KC (W.D. Tex. Aug. 3, 2021). Since then, the Court has extended the TRO and has held a hearing about whether to issue a preliminary injunction. *See* Order, *United States v Texas,* EP-21-CV-173-KC (W.D. Tex. Aug. 13, 2021).

The fact that enforcement is not imminent—and was not imminent at the time Plaintiffs filed this case—is fatal to their claims. Plaintiffs must establish standing as of "the time the action commences." *Stringer v. Whitley*, 942 F.3d 715, 724 (5th Cir. 2019). For prospective relief, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"[a]llegations of

9

possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotations omitted).

Plaintiffs have introduced no evidence that a single enforcement action has been taken or will be taken against them. Nor have Plaintiffs established that enforcement of GA-37—if it ever occurs—would apply to or interfere with their activities. DPS had not and has not issued the procedures that would explain how enforcement of GA-37 would occur. *See* Ex. 5 ¶ 15–16. Plaintiffs' claimed injuries are therefore speculative. *See*, *e.g.*, *Clark v. Edwards*, 468 F. Supp. 3d 725, 742 (M.D. La. 2020) (finding plaintiff's injury speculative and claim premature because procedures were not yet known).

Plaintiffs allege that the *existence* of GA-37 has exerted a chilling effect on their activities, but this too fails to constitute an injury in-fact. In appropriate cases, federal courts decide whether the *enforcement* of state law complies with federal law and, if warranted, can enjoin the *enforcement* of state law. Federal courts do not and cannot grant relief against the *existence* of a particular state law (or executive order). Plaintiffs acknowledge this reality by seeking an injunction against "enforcing Executive Order GA-37" rather than some sort of ruling deleting GA-37 from the official records. ECF 1 at 21.

In any event, a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. So long as Plaintiff bear no imminent risk of the State enforcing the executive order against them or their members, their reactions deriving from "subjective fear" do "not give rise to standing." *Clapper*, 568 U.S. at 418.

### C.    Alleged Harms Are Neither Traceable nor Redressable.

As explained below in Section II(B), the Governor does not enforce GA-37. For that reason, the Governor does not cause—and relief ordered against him would not redress—

10

Plaintiffs' asserted injuries. Plaintiffs' complaint "confuses [a] statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants." *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). In the interest of brevity, the Governor notes that this Court's analysis under *Ex parte Young* (addressed below) also bears on the standing analysis. *See City of Austin v. Paxton*, 943 F.3d 993, 1003 (5th Cir. 2019).

**II.      Plaintiffs' Constitutional Claims Are Barred by Sovereign Immunity.**

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine*." McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). That exception does not apply here as Governor Abbott lacks the authority to enforce GA-37 and Director McCraw has not exhibited a willingness to enforce GA-37 in a way that would constrain Plaintiffs.

**A.      Not Every State Official Falls under the *Ex parte Young* Exception**

*Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). It necessarily follows that for this exception to apply, the state official must have committed, or demonstrated a willingness to commit, some type of affirmative action contrary to federal law that the court can order the state official to cease performing. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (a proper defendant has both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

11

In other words, *Ex parte Young* allows suits for prospective relief against state officials, provided the state officials have sufficient "connection" to enforcing the allegedly unconstitutional action. *City of Austin*, 943 F.3d at 997. Otherwise, the suit is effectively against the state itself and barred by sovereign immunity. *See Va. Office for Prot. & Advocacy*, 563 U.S. at 253. Should "a state actor or agency [be] statutorily tasked with enforcing the challenged law and a different official is the named defendant," then the requisite connection is absent and "[the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998.

**B.      *Ex parte Young* Does Not Apply to Governor Abbott in This Case**

Under the above framework, Plaintiffs' constitutional claims against the Governor are precluded by sovereign immunity. Although the Governor issued GA-37 by means of his emergency powers, the statutory authority on which the Proclamation was based does not grant the Governor a corresponding duty to enforce the contents of his order. *See* TEX. GOV'T. CODE §§ 418.012, 418.016, 418.018(c). The Governor's proclamations "have the force and effect of law," without further action on his part. *Id.* at § 418.012. That duty instead falls to the Texas Department of Public Safety—the agency the Governor designated to enforce GA-37. *See* Ex. 1 ¶¶ 2–3. The Governor, as a consequence, lacks the necessary "connection" for *Ex parte Young* exception to apply.

The Fifth Circuit addressed this very issue in *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020), and *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *vac'd as moot*, 141 S. Ct. 1261 (2021). The court held that plaintiffs could not challenge a pandemic-related executive order by suing the Governor. "The power to promulgate law is not the power to enforce it." *In re Abbott*, 956 F.3d at 709; *accord Mi Familia Vota*, 977 F.3d at 467. A statute that empowers the Governor to "issue," "amend," or "rescind" executive orders cannot be read as the necessary "connection" to trigger the *Ex parte Young* exception. *Mi Familia Vota*, 977 F.3d at 467–68. This Court has

12

previously applied this limitation to hold that the Governor is not subject to *Ex parte Young* suits regarding executive orders. *See 6th St. Bus. Partners LLC v. Abbott*, 1:20-cv-706-RP, 2020 WL 4274589, at *5 (W.D. Tex. July 24, 2020). "By this reasoning, Plaintiffs may not rely on the *Ex parte Young* exception to obtain injunctive relief against [the Governor] in this case either." *Id.*

### C.   *Ex parte Young* Does Not Apply to Director McCraw in This Case

Sovereign immunity also precludes Plaintiffs' constitutional claims against Director McCraw. Even where a state official "has the authority to enforce" a law, a plaintiff must further establish that the state official "is likely to" enforce the law in a way that would "constrain" the plaintiff. *City of Austin*, 943 F.3d at 1001–02. A state official must have not only "the particular duty to enforce the statute in question" but also "a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). Here, Plaintiffs have not plausibly alleged that Director McCraw satisfies this standard. For one thing, Director McCraw has yet to draft, finalize, or promulgate procedures for GA-37's execution, meaning that Plaintiffs can only speculate as to how (and whether) DPS will enforce it. For another, this court issued a TRO in *United States v. Texas*, enjoining GA-37's enforcement on August 3, 2021. *See* Temporary Restraining Order, *United States v. Texas,* EP-21-CV-173-KC (W.D. Tex. Aug. 3, 2021). That order was extended on August 13, 2021, and remains in effect. *See* Order, *United States v Texas,* EP-21-CV-173-KC (W.D. Tex. Aug. 13, 2021). Plaintiffs cannot "point[] to specific enforcement actions of" the Director that "warrant[s] the application of the *Young* exception." *City of Austin*, 943 F.3d at 1001.

### III.   Plaintiffs Face No Irreparable Harm.

Even assuming Plaintiffs could overcome these jurisdictional flaws, Plaintiffs' bid for a preliminary injunction still should be denied at the outset because Plaintiffs cannot satisfy the key temporal prerequisite for such expedited, emergency relief: a "substantial threat of irreparable

13

injury if the injunction is not granted." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "An injunction is appropriate only if the anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Thus, "the asserted irreparable injury must be neither remote nor speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Yet such unsubstantiated speculation is all Plaintiffs offer in their motion.

Plaintiffs try to establish irreparable injury by conjuring up extreme and hypothetical harms that they believe will be visited upon them and their alleged members when DPS begins to enforce GA-37. *See* ECF No. 3 at 17–18. Of course, none of these imagined harms has come to pass. It is easy to understand why: the Executive Order has not yet been enforced, and there is no imminent prospect that it will be. Plaintiffs' claim to irreparable injury is therefore, at bottom, premature. Because the Executive Order has not yet been enforced and the precise contours of that enforcement have not been shaped, Plaintiffs cannot establish any "immediate" non-speculative injures. *La. Envt'l Soc., Inc. v. Coleman*, 524 F.2d 930, 933 (5th Cir. 1975). For that reason alone, this Court should deny Plaintiffs' request for injunctive relief. *See id*.

## IV.    Plaintiffs are Not Likely to Succeed on the Merits.

Additionally, Plaintiffs have not demonstrated a substantial likelihood of success on the merits.  GA-37 is not preempted or violative of intergovernmental immunity, especially as-applied to Plaintiffs.

### A.    Federal Law Does Not Preempt GA-37

Courts "start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This presumption against preemption applies "[i]n all pre-emption cases." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). But it "applies with particular force when Congress has legislated in a field traditionally occupied by the States," such as health

14

and safety. *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (identifying health and safety as "primarily, and historically, matters of local concern") (cleaned up).

Plaintiffs bring a facial, pre-enforcement preemption challenge against GA-37 on two primary theories: (1) "it contradicts federal admissions and release decisions," and (2) "it conflicts with federal control over the immigration system" ECF No. 3 at 8–9, 20 (requesting that this Court enjoin GA-37 "in its entirety"); *see also* ECF No. 1 at 21 (seeking declaration that "GA-37 is unconstitutional in its entirety"). "[A] facial challenge is 'the most difficult challenge to mount successfully, since the [plaintiff] must establish that no set of circumstances exists under which the [executive order] would be valid." *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (*quoting United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Even if Plaintiffs can dream up "some applications" of GA-37 that would impermissibly "implicate federal immigration priorities," that "does not mean that the [order] as a whole" should be enjoined. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1108 (9th Cir. 2016) (emphasis added). As the U.S. Supreme Court observed in *Edwards,* showing "that a possible application of" GA-37 "violated federal law" does "not sustain [Plaintiffs'] burden." 514 U.S. at 155 n.6. To succeed on their chosen theories, Plaintiffs must show that every application of GA-37 would stand as an obstacle to federal immigration law to secure relief. They cannot do so.

### 1. GA-37 Is Not an Obstacle to the Enforcement of Federal Immigration Laws.

Plaintiffs' preemption arguments are doomed. Plaintiffs fail to clear the "high bar" of showing that "no set of circumstances exists" under which GA-37 is lawful. *Puente Ariz.*¸ 821 F.3d at 1104. Instead, they speculate about how DPS will enforce GA-37 and, from there, argue that

15

Texas will co-opt the federal government's authority to determine immigration status. ECF No. 4 at 13–14.

In *City of El Cenizo*, the Fifth Circuit upheld legislation that mandated Texas law-enforcement agencies to comply with detainer requests submitted by ICE, even though the legislation contained an exception if the detainee showed "proof that the person is a citizen of the United States or . . . has lawful immigration status." 890 F.3d at 174–75, 188–89 (quoting Tex. Code Crim. Proc. § 2.251(b)). The court reasoned that even though the legislation permitted law enforcement to consult evidence of a detainee's immigration status, "the ICE agent made the underlying removability determination;" thus, Texas law enforcement would not be acting "*absent federal direction*." *Id.* at 189 (emphasis in original). That same principle applies here. If DPS orients its enforcement around federal determinations—as will no doubt occur at least some of the time, if not all the time—then Plaintiffs' preemption argument fails.

Plaintiffs do not contest that the State may act in conjunction with federal direction. That application alone is enough to defeat Plaintiffs' facial claim of preemption. After all, "[j]ust because [Texas] could . . . enforce" the Executive Order in ways that arguably are in tension with certain federal immigration laws, that "does not mean that the [Executive Order] as a whole should be struck down." *Puente Ariz.,* 821 F.3d at 1107–08.

However, Plaintiffs' inability to show that GA-37 is preempted in all applications is not their only problem: the government cannot even show that GA-37 is preempted in any specific application. Indeed, the thrust of Plaintiffs' argument is that GA-37 "targets the very immigrants whom the federal government has decided to release so that they can reside and move within the United States." But the fact that the Executive Branch allegedly lacks detention capacity to hold particular migrants does not mean that Congress has granted those migrants a federal-law right to

16

be free from state-law public-health regulations. Moreover, GA-37 also applies to immigrants who evade federal custody, meaning no one has decided they should be free to "reside and move within the United States." More generally, the doctrine of preemption does not immunize migrants from the incidental burdens that may arise on account of a state's public health policies. For that to occur, there must have been a "clear and manifest intent of Congress," which Plaintiffs cannot establish. *Wyeth*, 555 U.S at. 565 (quoting *Lohr*, 518 U.S. at 485); *Puente Ariz.*, 821 F3d at 1105.

Finally, Plaintiff's suggestion that GA-37 will prevent migrants from travelling to immigration hearings is meritless. ECF No. 4 at 2, 11. GA-37 does not prohibit individual migrants from traveling, much less from travelling to appear before an ICE agent or an immigration judge. GA-37 applies only to certain third parties providing ground transportation to a "group" of migrants. Ex. 1 ¶ 1. GA-37, in short, does not impede immigration enforcement. If anything, it is President Biden's "refusal to enforce the immigration laws enacted by Congress" that impedes immigration enforcement. *Id* at 1.

### 2. GA-37 Does Not Improperly Require State Officials to Make Discretionary Determinations about Federal Immigration Status

Plaintiffs argue that GA-37 is preempted because it was "designed to contradict federal immigration decisions" ECF No. 4 at 10. Not so. GA-37 does not regulate immigration, and it does not turn on "immigration status" or seek to countermand the federal government's determination of immigration status. GA-37 instead is a public-health measure making a public-health designation; for example, GA-37's purpose, stated in its text, is to improve "public health in Texas" and ameliorate "a public health disaster in Texas." Ex. 1 at 1–2. That is why GA-37 depends on

17

Title 42, "The Public Health and Welfare" Section of the U.S. Code, as opposed to Title 8, which deals with Aliens and Nationality.[1]

Federal law does not prohibit Texas from protecting public health during a pandemic. "[H]ealth laws of every description" are within the States' police powers. *Mayor, Aldermen & Commonalty of City of New York v. Miln*, 36 U.S. (11 Pet.) 102, 133 (1837) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824)). That GA-37 is within Texas's police power is shown by "its purpose, the end to be attained." *Id.*; *see also Gibbons*, 22 U.S. (9 Wheat.) at 203 (analyzing "[t]he object of inspection laws" in determining that they remain within a State's police power). The fact that GA-37 applies to people transporting migrants does not make it any less of an internal issue suitable for the State's police power. Even when "aliens are the subject of a state statute," that "does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). GA-37 does neither of those things.

Even if GA-37 "may have a remote and considerable influence on" migrants, that does not mean that "that a power to regulate [immigration] is the" only "source" of authority that can support GA-37. *Gibbons*, 22 U.S. (9 Wheat.) at 203. "[T]he general power of the states to regulate their own internal police" supports efforts "to guard against . . . physical pestilence" from "infectious disease" brought by travelers. *Miln*, 36 U.S. (11 Pet.) at 142–43. "Can anything fall more directly within the police power and internal regulation of a state, than that which concerns the care and management of . . . persons that may be thrown into the country, and likely to endanger its safety?" *Id.* at 148 (Thompson, J., concurring).

---

[1] *See, e.g., Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed Reg 38717 (July 16 2021).

Acknowledging State authority over public health problems posed by migrants with COVID-19 does not "cast any reproach upon foreigners who may arrive in this country." *Id.* "But if all power to guard against these mischiefs is taken away, the safety and welfare of the community may be very much endangered." *Id.*

Plaintiffs rely on *Arizona v. United States*, 567 U.S. 387 (2012), but in that case, an Arizona statute was preempted because "[i]ts stated purpose" was "to 'discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." *Id.* at 393. The Arizona law "violate[d] the principle that the removal process is entrusted to the discretion of the Federal Government" "[b]y authorizing state officers to decide whether an alien should be detained for being removable." *Id.* at 409. That was a problem because "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States." *Id.* "Decisions of this nature touch on foreign relations and must be made with one voice." *Id.* As the Supreme Court later explained, the key to its decision in Arizona was that Congress "confer[red] a federal right" on aliens "to be free from [state-level immigration] requirements." *Murphy v. NCAA*, 138 S. Ct. 1461, 1481 (2018).

That principle does not apply here. GA-37's "stated purpose" is to promote public health, not regulate immigration. For that reason, GA-37 does not turn on removability, and it does not allow state officers to decide who "should be detained," much less based on federal immigration status. *Id.* Nor does it address who should "continue living in the United States" or "touch on foreign affairs." *Id.* And Congress certainly has not conferred any federal-law right to disregard state-level public-health restrictions: "[I]t cannot be claimed, that [those providing transportation to migrants], are exempted from any duty imposed by the laws of a state, after their arrival within

19

its jurisdiction; or have a right to wander, uncontrolled, after they become mixed with the general population of the state." *Miln*, 36 U.S. (11 Pet.) at 147 (Thompson, J., concurring).

Plaintiffs next rely on *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (en banc), but the court, in that case, fractured without producing a majority opinion. *See id.* at 525–26 (showing that only five of fifteen judges joined the opinion Plaintiff cites). And the subsequent decision Plaintiffs cite as allegedly affirming *Farmers Branch* in fact concluded that *Farmers Branch's* holding was not relevant to the analysis. *See City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 188–89 (5th Cir. 2018) (noting that the status-determinations at issue were made with federal direction). *Farmers Branch* does not apply for the same reasons *Arizona* does not apply. It analyzed an immigration classification, not a public-health classification. *See Farmers Branch*, 726 F.3d at 536 ("the legality of a non-citizen's presence").

Perhaps state-level prohibitions on transporting migrants would raise preemption issues if pursued for purposes of regulating immigration. But GA-37 does no such thing. It has an entirely different "object": public health. *Gibbons*, 22 U.S. (9 Wheat.) at 203. Thus, it flows from the State's police power without claiming a power over immigration. That matters. "All experience shows, that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers." *Gibbons*, 22 U.S. (9 Wheat.) at 204.

### 3.   The Biden Administration Is Violating Title 42.

As stated above, Plaintiff's fundamental complaint seems to be that GA-37 may pose inconveniences for aliens released into the United States. *See* ECF No. 4 at 11 (discussing aliens' abilities to "get to their addresses in Texas and elsewhere" after being released from federal custody). Some level of inconvenience for potentially COVID-infected illegal aliens is an unavoidable result of protecting public health during a pandemic. But regardless, public-health-justified inconvenience for migrants cannot support preemption.

Plaintiffs cannot credibly argue that GA-37 interferes with the federal government's ability to physically release migrants. Preventing third parties from providing transportation to migrants does nothing to prevent the federal government from releasing individuals from detention. But even if it did, federal law still would not preempt GA-37. After all, the federal government is not supposed to be releasing these migrants anyway; the CDC's Title 42 Order determined "that a suspension of the right to introduce such persons . . . is required in the interest of the public health." 42 U.S.C. § 265; *see* 86 Fed Reg 38717. Exceptions to that rule are themselves unlawful—a claim Texas is currently pursuing in the Northern District of Texas. *See* Complaint, *Texas v. Biden*, No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021).

Indeed, even apart from Title 42, the federal government is obligated to detain aliens "[f]or the purpose of determining whether" they are "inadmissible . . . by reason of being afflicted with" covered "diseases." 8 U.S.C. § 1222(a). This is a mandatory duty: "[A]liens shall be detained . . . ." *Id.*; *see also* 8 C.F.R. § 232.3 ("shall"). COVID-19 is covered because it is a "communicable disease of public health significance." 8 U.S.C. § 1182(a)(1)(A)(i).

Instead of complying with its non-discretionary duty to detain aliens until determining whether they have COVID-19, the federal government is simply releasing the aliens from federal custody without testing them. The fact that non-profit organizations sometimes test aliens for COVID-19 after they are released is not sufficient to protect public health. *See* ECF No. 3 at 2 (explaining that CBP "coordinates with NGOs when releasing" aliens, who receive "COVID-19 testing" from the NGO only after being released). By then, the cat is out of the bag.

Consider, for example, a family of migrants released in La Joya, Texas. The family went to a public restaurant and began "coughing and sneezing without covering their mouths." Ex. 6. They "were not wearing face masks." *Id.* When a citizen complained, a La Joya police officer

21

learned that the family "had been apprehended by Border Patrol days prior" but "were released because they were sick with Covid-19." *Id.* Incidents like this one necessitated GA-37: "[B]usloads of migrants, an unknown number of whom are infected with COVID-19, are being transported to communities across the State of Texas, exposing Texans to the spread of COVID-19, as has already been reported in cities like La Joya, among others. Ex. 1 at 1–2.

The Executive Branch is not following congressional commands. Lawmakers have noticed. Representative Tony Gonzales, for example, has emphasized that migrants "must be tested" and that the federal government must "ensure that we're not releasing COVID-positive migrants into any community." Tiffany Huertas, *Lawmakers ask Biden Administration to Prioritize Health of Border Agents, Communities*, KSAT.com (July 28, 2021), https://www.ksat.com/news/local/2021/ 07/28/lawmakers-ask-biden-administration-to-prioritize-health-of-border-agents-communities/.

Texas has challenged the Biden Administration's unlawful actions, under both the Administrative Procedure Act and the Immigration and Nationality Act. *See* Complaint, *Texas v. Biden,* No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021). Judge Pittman has already considered one motion for preliminary injunction, which subsequent agency action mooted, and granted Texas leave to amend its complaint. He underscored the stakes of the Biden Administration's failures: "Negligently allowing even one COVID-19-positive UAC into the country in the middle of a pandemic would be problematic, but willfully admitting thousands of COVID-19 positive UAC is deplorable." Order, *Texas v. Biden*, No. 4:21-cv-579, ECF No. 54 at 6 n.6 (N.D. Tex. July 29, 2021).

Even if GA-37 impeded the federal government's ability to release migrants potentially infected with COVID-19, GA-37 would not violate federal law. It would vindicate federal law. Because the Biden Administration's actions are themselves unlawful, the Supremacy Clause does

22

not protect them from any inconveniences posed by state law. Under our Constitution, "the supreme Law of the Land" includes "the Laws of the United States," not federal agency action in derogation of those laws. U.S. Const. art. VI, cl. 2.

### B.      GA-37 Does Not Infringe on Intergovernmental Immunity.

As an initial matter, Plaintiffs argue that the doctrine forbids state actions that "retard, impede, burden, or in any manner control" how the federal government executes federal laws, ECF No. 4 at 17 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819)), but that argument "has now been 'thoroughly repudiated.'" *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (quoting *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)). Rather, a "state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *Id*. And the "Supreme Court has clarified that a state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" *United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019) (quoting *Washington v. United States*, 460 U.S. 536, 544–45 (1983)).

GA-37 does nothing of the sort. Unlike prohibited state actions, GA-37 does not discriminate. It does not subject facilities where detainees are held to different standards than it subjects other facilities or require state authorities to second-guess the decisions of federal officials. *Cf. California*, 921 F.3d at 885–86 (enjoining state statute that did so). It does not impose elevated standards for inspection and cleanliness on federal contractors and projects. *Cf. Boeing Corp. v. Movassaghi*, 768 F.3d 832, 839–40 (9th Cir. 2014) (enjoining state statute that did so). Instead, GA-37 explicitly treats federal law-enforcement officers the same way it treats state and local law-enforcement officers. It uniformly prohibits *anyone* who is not a federal, state, or local law-enforcement officer from furnishing ground transportation to certain groups of migrants—just as North Dakota was allowed to uniformly regulate every liquor distributor operating within its

23

borders, whether it sold to the federal government or not, and as Washington was allowed to impose a tax on every government building contractor operating within its borders, whether it contracted only with the federal government or not. *See North Dakota*, 495 U.S. at 436–38; *Washington*, 460 U.S. at 544–46.

Nor can the Plaintiffs retreat to the proposition articulated in *Blackburn v. United States* that "states may not directly regulate the Federal Government's operations or property." 100 F.3d 1426, 1435 (9th Cir. 1996). *Blackburn* involved California's attempts to impose penalties on the federal government for maintaining national park structures that did not comport with California safety codes. *Id.* GA-37 does not regulate activities on federal property. It addresses only "ground transportation [of] a group of migrants," an exercise of the State's police power to protect the health of its citizens from transmission of a communicable disease that has caused a national health emergency that the federal government itself extended only days before GA-37 was issued. *See* Xavier Becerra, *Renewal of Determination That a Public Health Emergency Exists*, (July 19, 2021), available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx.

That said, even if intergovernmental immunity does preclude the application of GA-37 to the government itself, Plaintiffs cite no authority for the proposition that intergovernmental immunity extends to individuals and nonprofit organizations, who of their own volition, provide services to illegal immigrants that were released or evaded federal custody. ECF No. 4 at 18. The most it can point to are cases holding that "a private entity with which the federal government deals can assert immunity." *See Boeing Co.*, 768 F.3d at 842. But it is one thing to protect entities bound by contract to pursue the federal government's goals. It is another thing to immunize from state law every individual or entity that acts in response to federal policy or receives federal funds.

24

And it is yet another thing entirely to claim that power for every individual or entity that chooses to call themselves a federal "provider"—a term far too ambiguous to have any real content.[2]

## V.    The Equities and Public Interest Foreclose a TRO Here

The equities and public interest strongly favor Texas's efforts to protect the public health. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Tex. All. for Retired Americans v. Hughs*, 976 F.3d 564, 569 (5th Cir. 2020) (per curiam) quoting *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam)). Texas is similarly harmed when its officials are enjoined from enforcing an executive order. *See Mi Familia Vota v. Abbott*, 834 F. App'x 860, 865 (5th Cir. 2020) (per curiam).

Courts are rightly reluctant to enjoin public-health measures. As the Supreme Court explained during a previous epidemic: "Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Jacobson*, 197 U.S. at 28.

Plaintiffs, in contrast, do not face a substantial threat of imminent and irreparable injury as a result of the Governor's executive order. They therefore will derive no benefit from a preliminary injunction. DPS, the state agency charged with GA-37's implementation, has yet to enforce the executive order's edicts against any entity or person, and there is no reason to think it will do so imminently. It is entirely speculative to assume that DPS would enforce GA-37 in a manner that would interfere with Plaintiffs' operations. Direct McCraw in fact stated in his declaration that he

---

[2] Plaintiffs asserted a Fourth Amendment claim in their complaint but omitted that claim from their motion for preliminary injunction. Accordingly, Defendants do not address the merits of Plaintiffs' Fourth Amendment claim here but will do so if and when it becomes necessary.

ordered DPS Regional Director Victor Escalon to meet with nonprofit groups that transport migrants so that DPS might understand the organizations' perspective and concerns and incorporate them into workable procedures. Ex. 5 ¶ 18.

## VI.    The First-Filed Rule Prevents the Entry of Injunctive Relief.

In light of the "substantial overlap" between this case and the first-filed Title 42 case in the Northern District of Texas, *Texas v. Biden*, No. 4:21-cv-579 (N.D. Tex.), the Court should transfer this case to the Northern District without entering an injunction. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). Because there is, at the very least, a "likelihood of a substantial overlap between the two suits," determining whether to consolidate the two cases "is reserved only for the first-filed court." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605–06 (5th Cir. 1999). "[T]he 'first to file rule' not only determines which court may decide the merits of substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997).  Hence, an injunction to "preserve the status quo"—even if it were otherwise proper—cannot issue because "it [is] up to" the first-filed court "to determine whether an injunction [is] necessary." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 730 (5th Cir. 1985) (vacating a district court's preliminary injunction).

## CONCLUSION

Governor Abbott and Director McCraw respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Date: August 23, 2021

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Tex. State Bar No. 24076720

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

LEIF A. OLSON
Special Counsel
Tex. State Bar No. 24032801

J. AARON BARNES
Special Counsel
Tex. State Bar No. 24099014

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
judd.stone@oag.texas.gov
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
leif.olson@oag.texas.gov
aaron.barnes@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that on August 23, 2021, a true and accurate copy of the foregoing document was

filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

27