**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; FIEL HOUSTON<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; and STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety<br><br>Defendants. | Case No. 3:21-cv-00178-KC |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.  Texas's Threshold Arguments Fail.................................................................................... 3

        A.  Plaintiffs Have Standing. ........................................................................................ 3

        B.  Defendants Can Be Sued Under *Ex Parte Young*. ............................................. 4

    II.  The Executive Order Is Preempted. ............................................................................... 6

        A.  The Order Conflicts with Federal Immigration and Humanitarian Law. ..................... 6

        B.  The Order Imposes Detention and Penalties Based on Unilateral
           Status Determinations. .............................................................................................. 8

        C.  The Order Conflicts with Federal Anti-Harboring Law............................................... 9

        D.  Texas's *Salerno* Argument Is Wrong........................................................................ 10

        D.  Texas's Belief that DHS Is Violating the Law Does Not Empower It to Thwart the
           Federal System.......................................................................................................... 10

    III.  The Executive Order Violates Intergovernmental Immunity. .......................................... 13

    IV.  Texas's First-to-File Argument Is Meritless..................................................................... 13

    V.  The Equities Strongly Favor an Injunction. ..................................................................... 14

CONCLUSION............................................................................................................................ 16

**TABLE OF AUTHORITIES**

**Cases**

*Air Evac EMS, Inc. v. Texas Dep't of Ins.*,
  851 F.3d 507 (5th Cir. 2017) .................................................................................. 5

*Anderson v. Edwards*,
  514 U.S. 143 (1995)................................................................................................ 11

*Arizona v. United States*,
  567 U.S. 387 (2012)......................................................................................... passim

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979)................................................................................................. 4

*Baltimore v. Trump*,
  416 F. Supp. 3d 452 (D. Md. 2019) ........................................................................ 9

*BNSF Ry. Co. v. OOCL (USA), Inc.*,
  667 F. Supp. 2d 703 (N.D. Tex. 2009) .................................................................. 14

*City of New York v. Miln*,
  36 U.S. (11 Pet.) 102 (1837).................................................................................... 9

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)........................................................................................... 10, 12

*Ex parte Young*,
  209 U.S. 123 (1908)............................................................................................. 5, 6

*Villas at Parkside Partners v. City of Farmers Branch*,
  726 F.3d 524 (5th Cir. 2013) (en banc) .......................................................... passim

*Frank v. Commonwealth of Antigua & Barbuda*,
  842 F.3d 362 (5th Cir. 2016) ................................................................................... 6

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)................................................................................................... 9

*Georgia Latino All. v. Gov. of Ga.*,
  691 F.3d 1250 (11th Cir. 2012) ............................................................................... 9

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824)..................................................................................... 9

ii

*Hart v. Donostia LLC*,
  290 F. Supp. 3d 627 (W.D. Tex. 2018)..................................................................... 14

*In re MPF Holdings US LLC*,
  701 F.3d 449 (5th Cir. 2012) ....................................................................................... 6

*Int'l Fidelity Ins. Co. v. Sweet Little Mexico Corp.*,
  665 F.3d 671 (5th Cir. 2011) ..................................................................................... 14

*League of Women Voters of Indiana, Inc. v. Sullivan*,
  5 F.4th 714 (7th Cir. 2021) ....................................................................................... 11

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013)....................................................................................... 10

*Matter of Cajun Electric Power Co-op, Inc.*,
  109 F.3d 248 (5th Cir. 1997) ..................................................................................... 13

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007).................................................................................................... 3

*Mi Familia Vota v. Abbott*,
  977 F.3d 461 (5th Cir. 2020) ....................................................................................... 6

*Nixon v. Missouri Municipal League*,
  541 U.S. 125 (2004).................................................................................................. 12

*Puente Arizona v. Arpaio*,
  821 F.3d 1098 (9th Cir. 2016) ................................................................................... 10

*Seals v. McBee*,
  898 F.3d 587 (5th Cir. 2018) .................................................................................. 3, 4

*State v. Biden*,
  2021 WL 3674780 (5th Cir. Aug. 19, 2021)............................................................. 16

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).................................................................................................... 3

*Truax v. Reich*,
  239 U.S. 33 (1915)................................................................................................... 6, 7

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012). .............................................................................. 7, 12

iii

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ......................................................................................... 3

*United States v. Salerno*,
   481 U.S. 739 (1987).................................................................................................... 10

*Valle del Sol v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ..................................................................................... 9

**Statutes**

8 U.S.C. § 1158(a) ........................................................................................................ 7

8 U.S.C. § 1158(d)(2)  ................................................................................................. 7

8 U.S.C. § 1182(d)(5) .................................................................................................... 7

8 U.S.C. § 1225(b)(2)(A) .............................................................................................. 8

8 U.S.C. § 1229(a)(2)..................................................................................................... 7

8 U.S.C. § 1229a(b)(5)(A) ............................................................................................ 7

8 U.S.C. § 1357(a)(2)..................................................................................................... 8

Tex. Gov't Code § 418.018(c) ....................................................................................... 5

**Other Authorities**

DHS Office of Immigration Statistics, *COVID-19 Vulnerability by Immigration Status*,
   (May 2021)................................................................................................................ 16

Greg Norman, *Number of COVID-positive migrants released in Texas surges, officials say*,
   Fox News (Mar. 8, 2021)........................................................................................... 16

Michelle Hackman, *Why Illegal U.S. Border Crossings Likely Aren't Fueling the COVID-19 Surge*, Wall St. J. (Aug. 21, 2021) ............................................................................... 15

**INTRODUCTION**

Texas's most consistent argument, on almost every issue, is that despite the executive order's clear terms, the Department of Public Safety ("DPS") may decide to not enforce it, or barely enforce it.  PI Opp. 9-10 (standing), 13 (sovereign immunity), 15-16 (preemption), 25-26 (equities).  But Texas cannot avoid an injunction of such a clearly illegal policy—which by its terms is "effective immediately"—simply by postponing the issuance of enforcement guidance. The State's own evidence makes clear that DPS fully intends to enforce the order, and during the first two days it was in effect, DPS took multiple affirmative steps toward implementation.

Texas claims that Plaintiffs' harms are speculative, but it does not and cannot deny that their activities fall squarely within the order's plain terms.  Indeed, DPS has stated that it plans to stake out shelters like Plaintiff Annunciation House, preventing them from giving families shelter, food, COVID testing, and vaccines, and potentially shutting them down entirely.  Under the clear terms of the order, migrants living in Texas, including members of FIEL Houston, are barred by law from taking group transport to engage in the normal activities of daily life, such as school, work, immigration court, and ordinary travel with family.  Thousands more would be stranded in border communities unable to take cars and buses to onward destinations.  Texas does not dispute that the order's language prohibits all of these activities.  And even those who fall outside the order's terms are subject to seizure, interrogation, and arrest if Texas officers believe they fall into certain immigration status categories.

On the merits, Texas offers almost nothing to contest preemption.  It concedes that States cannot second-guess federal release decisions, and yet admits that the order is "chiefly concerned" with freezing the movement of asylum seekers DHS has chosen to release.  It also concedes that States cannot unilaterally detain people based on immigration status.  Yet, as Plaintiffs explained

1

in their opening brief, for DPS officers to apply the order they must make *multiple* immigration status determinations.  Texas offers no response to this problem.  Texas likewise fails to respond to Plaintiffs' explanation of how the Order conflicts with federal anti-harboring law, a conflict that is dispositive under binding precedent.

Rather than meaningfully contest any of this, Texas's main merits argument is that no matter how deep the order's conflict with federal law, its "stated purpose" alone—supposedly protecting public health—makes it valid.  But the Supreme Court has squarely rejected that idea.

Texas's other preemption defense is that even if 99.9% of the order's applications undermine federal law, there should be no injunction if Texas can hypothesize *any* potentially valid applications.  But that argument was raised and rejected in *Arizona* and *Farmers Branch*, and is incompatible with the federal government's power over immigration and foreign affairs, where (as Texas concedes) decisions about the treatment of noncitizens must be made with one voice.

Nor has Texas shown that targeting asylum seekers is likely, much less necessary, to promote public health.  The State has failed to provide *any* convincing evidence that migrants are spreading COVID-19 more than those already in Texas, where COVID-19 is already endemic and Governor Abbott has prevented localities from adopting public health measures at every turn— including banning mask requirements in public schools the day after issuing his transport ban. Recent reports make clear that migrants do not have higher positivity rates than others in Texas, and if anything, they are less likely to be infected than the general population.  And the order's mismatch with any health rationale is extreme:  It bans transport for thousands of migrants who are vaccinated, or just tested negative, or entered the country before the pandemic—none of whom present any elevated risk even on Texas's theory.  And the order does nothing to restrict the movement of millions of unvaccinated Texans, or people with active infections, or hundreds of

thousands of others who cross the Texas-Mexico border every day.  Texas makes no attempt to explain these startling conflicts between the order's stated rationale and its actual terms.

**ARGUMENT**

**I.      Texas's Threshold Arguments Fail.**

**A.  Plaintiffs Have Standing.**

Plaintiffs plainly have standing.  By its clear terms, the order regulates them directly and subjects them to stops, fines, and impoundment, "effective immediately."  EO at 2.  It is well established that Plaintiffs can challenge a rule that curtails their activities without waiting for the harm to occur.  *See Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018) (standing where plaintiff is "legally subject to prosecution" under the text of the law); *United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010) (standing to challenge law that applied on its face, despite the government's "promise of self-restraint").

Texas's contrary arguments are meritless.  First, Texas gets the standard for a pre-enforcement challenge wrong.  A plaintiff has standing "if the threatened injury is certainly impending, *or* there is a substantial *risk* that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up) (emphasis added).  And "where threatened action by *government* is concerned," a plaintiff need not "expose himself to liability before bringing suit to challenge the basis of the threat."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).  Plaintiffs face a substantial risk of enforcement, because their activities fall squarely within the plain terms of the order—something Texas does not dispute—and the DPS Director has declared *in this case* that he plans to enforce the order.  McCraw Decl., Dkt. 23-1 ¶¶ 11, 14-17 (describing plans to effectuate "the goals set forth in GA-37").  Moreover, on the afternoon the order was issued, a DPS officer told the executive director of Catholic Charities of the Rio Grande

3

Valley (a shelter like Annunciation House) that DPS planned to enforce the order against the shelter, Pimentel Decl., Dkt. 25-1 ¶ 11-12; Texas does not deny that this threat was made. Particularly in this context, Plaintiffs' evidence easily suffices for standing. *See* Garcia Decl. ¶¶ 28-33 (order bars Annunciation House's transport activities and could cause its closure); Espinosa Decl. ¶¶ 8-16 (order bars FIEL members from group transport for all sorts of essential activities and requires FIEL to divert significant resources); Harbury Decl. ¶¶ 26-28 ("impossible situation" requiring either ceasing humanitarian activities or risking vehicle impoundment); Sandefur Decl. ¶¶ 11-13 (order would bar much of Angry Tias' work).

Even where a provision has never been enforced, standing exists where "the government w[ill] not disavow prosecution if plaintiffs engage[] in their course of action." *Seals*, 898 F.3d at 592 (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979)). Texas conspicuously declines to disavow enforcement against Plaintiffs. *See* PI Opp. 24-25 (arguing Texas can enforce the order specifically against Plaintiffs). And, as noted, DPS says it plans to enforce the order, including specifically against shelters like Annunciation House. Texas's argument seems to be that it defeats standing simply to say the government *could*, in the future, disavow enforcement. But that possibility, which always exists, is not enough to defeat standing.

Texas's only other argument is that the existing TRO in *United States v. Texas* deprived Plaintiffs of standing. But a *temporary* restraining order (which expires in two days) obviously does not eliminate the threatened harm.

### B.  Defendants Can Be Sued Under *Ex Parte Young*.

The *Ex parte Young* exception to sovereign immunity is a critical check on illegal governmental conduct, which allows plaintiffs to sue for an injunction against the state officials

4

tasked with enforcing a law. Yet Texas claims that neither the head of the agency tasked with enforcing the executive order nor the Governor qualifies for this exception. That is wrong.

*Ex parte Young* applies to both Director McCraw and Governor Abbott, because both "have 'some connection' to the state law's enforcement and threaten to exercise that authority." *Air Evac EMS, Inc. v. Texas Dep't of Ins.*, 851 F.3d 507, 517 (5th Cir. 2017) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). First, as Defendants do not contest, the executive order assigns its enforcement to Director McCraw. EO §§ 2-3. And he has plainly evinced a "willingness" to enforce the statute. PI Opp. 11. DPS informed a major shelter that as soon as guidance is drafted, DPS plans to station cars outside to bar the entry and exit of migrants. Pimentel Decl. ¶ 11, 12. And in this case, Director McCraw has stated that "DPS intends to draft procedures" for enforcement, and has personally taken numerous steps to do so, including "reaching out to state, federal, and private entities" to craft "enforcement guidelines." McCraw Decl., Dkt. 23-1, ¶ 15, 17-19 (personally speaking with Border Patrol officials and directing DPS regional director to meet with nonprofit group). He thus has already taken "specific action[s] predicated on the" executive order, *Air Evac*, 851 F.3d at 518, and he fits easily within the *Ex parte Young* exception.

Second, because Governor Abbott issued the executive order pursuant to his disaster authority, its enforcement sufficiently implicates the Governor for *Ex parte Young*. State disaster law provides that "[t]he governor may *control* ingress and egress to and from a disaster area and the movement of persons . . . in the area." Tex. Gov't Code § 418.018(c). It also provides for the governor's "use [of] all available resources of state government . . . reasonably necessary to cope with a disaster." *Id.* § 418.017(a). And it provides that he "may . . . direct the activities of" the

5

Department of Public Safety "during a public disaster." *Id.* § 411.012.[1]  Governor Abbott's actions

purportedly under any of those authorities have sufficient "connection with the enforcement of the

[challenged] act" for *Ex parte Young*.  209 U.S. at 157.[2]  In any event, to defeat Texas's immunity

defense, Plaintiffs need identify only one proper defendant—which Director McCraw plainly is.

## II.     The Executive Order Is Preempted.

Plaintiffs previously explained that the order conflicts with federal law in three ways, and

Texas barely denies that its scheme would indeed conflict with federal authority on a massive

scale.  Instead, it primarily urges the Court to uphold the order *in spite of* its conflict with the

federal scheme.  Its two main reasons—that the stated purpose alone can defeat preemption, and

that a single valid application defeats this challenge—have been rejected by the Supreme Court.

### A.  The Order Conflicts with Federal Immigration and Humanitarian Law.

As Plaintiffs have explained, the Governor's order invalidly seeks to dictate which

migrants can live and move within the United States, and which migrants will be either kept at the

border, or, if they already live elsewhere in Texas, severely curtailed in their movement.  PI Br.

10-12.  It would be remarkable if each State could decide for itself which sets of migrants can and

cannot be transported within their States.  The treatment of noncitizens in our country "touch[es]

on foreign relations and must be made with one voice." *Arizona v. United States*, 567 U.S. 387,

409 (2012); *see Truax v. Reich*, 239 U.S. 33, 42 (1915) (States cannot impose restrictions that

---

[1] By contrast, in the cases Texas cites, unlike here, there was "no suggestion in any statute or regulations" that the Governor could "play a role in enforcing the executive order at issue." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467-68 (5th Cir. 2020).

[2] Prior to any adverse ruling on *Ex parte Young* in this context, Plaintiffs request limited jurisdictional discovery as to the Governor's Office's involvement in the order's implementation or DPS's development of enforcement guidance.  Such discovery is appropriate in light of the Governor's invocation emergency power to closely direct DPS. *See In re MPF Holdings US LLC*, 701 F.3d 449, 457 (5th Cir. 2012) (describing availability of jurisdictional discovery as to factual issues); *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 n.4 (5th Cir. 2016).

effectively "deny [] entrance and abode" to "lawfully admitted" noncitizens).  The order thus invades the federal prerogative to "determin[e] whether it is appropriate to allow a foreign national to continue living in the United States," *Arizona*, 567 U.S. at 409, and conflicts with asylum seekers' federal "permission to remain lawfully within the country," *United States v. Alabama*, 691 F.3d 1269, 1293-95 (11th Cir. 2012).

Texas does not deny that the order targets migrants whom DHS has chosen to release so that they can pursue asylum while living in the United States.  PI Opp. 5 (calling such migrants the order's "chief[] concern[]"); EO at 2 (same); Pimentel Decl. ¶ 11-12 (targeting shelters that house asylum seekers DHS has released).  Rather, Texas claims that it *can* target released asylum seekers, because curtailing their movement and forcing them to remain at the border does not conflict with their federal permission to live in the country.  PI Opp. 16-17 (arguing that the federal scheme does not give "migrants a federal-law right to be free" from such restrictions).  But when DHS gives permission to enter and live in the United States, a State cannot functionally take it away by preventing the person from leaving the border or maintaining a basic daily existence.  As has been clear for a hundred years, when a person is permitted into "the country under the authority of the acts of Congress," States cannot prevent them from "enjoying in a substantial sense and in their full scope the privileges conferred" by that permission.  *Truax*, 239 U.S. at 42.

Moreover, as Plaintiffs have explained, asylum seekers have a number of rights and responsibilities in the federal system.  Congress has enacted an extensive scheme giving migrants the right to apply for asylum, 8 U.S.C. § 1158(a)(1), giving DHS discretion to release them, *id.* § 1182(d)(5)(A), and, once released, giving asylum seekers the right to choose their address in the United States, *id.* § 1229(a)(1)(F)(i), the ability to work, *id.* § 1158(d)(2), and the responsibility to participate in immigration proceedings, *id.* §§ 1229(a)(2), 1229a(b)(5)(A).  The executive order

7

undermines all of these federal rights and responsibilities.   PI Br. 11-12.  Texas gives no further response.

**B. The Order Imposes Detention and Penalties Based on Unilateral Status Determinations.**

The enforcement of the order's substantive prohibitions will create yet more preemption problems.  PI Br. 12-15.  The governing principle could not be clearer: It "disrupt[s] the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Arizona*, 567 U.S. at 413; *Villas at Parkside Partners v. Farmers Branch*, 726 F.3d 524, 532, 535 (5th Cir. 2013) (same).  Federal law simply "does not allow state or local officers to adopt [such an] enforcement mechanism." *Arizona*, 567 U.S. at 413.  Yet that is precisely the enforcement mechanism the executive order adopts.

Texas asserts that the order "does not allow state officers to decide who 'should be detained' . . . based on federal immigration status."  PI Opp. 19.  But Plaintiffs have already explained why that is wrong.  PI Br. 13-14.  To enforce the order, DPS officers must determine whether a person was "subject to expulsion under the Title 42 order" or "detained by CBP for crossing the border illegally." EO § 1.  Title 42's applicability, in turn, depends entirely on a series of status and citizenship determinations.  PI Br. 4.  And whether a person's entry was "illegal[]" depends on their visa situation, immigration status, and citizenship. EO § 1.  Nor does the fact of CBP detention answer the question, because CBP detains people not just for improper entry, but also at ports of entry, 8 U.S.C. § 1225(b)(2)(A), based on unlawful presence (including, for example, overstaying a visa), *id.* § 1357(a)(2), and sometimes erroneously.  Again, Texas does not respond.

Instead, the State's core argument is that the order's "stated purpose"—allegedly "public health"—immunizes it from preemption, even if in operation it conflicts with the federal scheme.

8

PI Opp. 17-20. But even if the Court were to credit that (doubtful) asserted purpose, the Supreme Court has rejected this "aberrational doctrine," which would allow States to "nullify nearly all unwanted federal legislation by simply" citing a valid purpose. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105-06 (1992) (cleaned up); *Georgia Latino All. v. Gov. of Ga.*, 691 F.3d 1250, 1265 n.11 (11th Cir. 2012) (rejecting same argument). Texas cites no case in which a valid claimed "purpose" alone saved a law that conflicted with federal law in practice. To the contrary, States with preempted laws *always* cite some proper purpose in defending them. PI Br. 16-17. Nor is the order's stated health purpose believable given its tenuous connection to any conceivable health benefit, *infra* Part V, and its proximity to numerous other executive actions targeting migrants.

Texas's only other defense to this claim is a non-sequitur. It quotes extensively from two early 19th-century cases dealing with state inspection laws. PI Opp. 18-20 (quoting *Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824)). But neither case addressed any conflict with the federal immigration scheme, because both cases long predate both modern preemption jurisprudence and the entire modern statutory immigration scheme. *See Baltimore v. Trump*, 416 F. Supp. 3d 452, 472 n.3 (D. Md. 2019) (discussing history).

### C. The Order Conflicts with Federal Anti-Harboring Law.

As Plaintiffs explained, the executive order also conflicts with federal harboring law, because it penalizes the transport of migrants far beyond the equivalent federal statute. PI Br. 15. States cannot expand pre-existing federal restrictions on the "transport and movement of aliens," as multiple circuits including the Fifth Circuit have held. *Georgia*, 691 F.3d at 1264; *see Farmers Branch*, 726 F.3d at 531 & n.9; *Valle del Sol v. Whiting*, 732 F.3d 1006, 1026-28 (9th Cir. 2013).

Texas does not offer a single word in response. Any argument on this point is waived.

### D. Texas's *Salerno* Argument Is Wrong.

Texas contends that if it can identify *any* situation where the executive order could be legally applied, then the order must stand—even if 99.9% of its applications are unlawful. PI Opp. 15 (relying on *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is not the law.

Both *Arizona* and *Farmers Branch* rejected this argument and facially invalidated state immigration laws. The dissents in both cases specifically pointed to *Salerno* as a reason why the facial preemption challenges should fail. *Arizona*, 567 U.S. at 457-58 (Alito, J., dissenting in relevant part) (identifying applications that would not be preempted); *Farmers Branch*, 726 F.3d at 564-65, 577 (Jones, J., dissenting) (similar). The majorities were unmoved by that concern and enjoined the relevant provisions in full. This Court should do the same. *See Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013) (explaining that the *Arizona* majority rejected the application of *Salerno*).

Courts have not applied *Salerno* in this context because state immigration laws pose a constant "potential for conflict" with federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n.7 (2000). In *Arizona*, for instance, the Court enjoined the State's immigration-arrest scheme because it "could" result in arrests that DHS officials did not want, and "[d]ecisions of this nature touch on foreign relations and must be made with one voice." 567 U.S. at 408-09. Of course, not *every* state immigration arrest would have necessarily impacted foreign relations, but the ever-present possibility of conflict was enough to undermine federal authority. Texas's primary case recognized the same dynamic. In *Puente Arizona v. Arpaio*, the Ninth Circuit explained that facial invalidation *is* proper for a statute that "singles out" migrants, because "every application of the statute ha[s] the *potential* to conflict with federal immigration policy." 821 F.3d 1098, 1107 (9th Cir. 2016) (emphasis added). So too here.

10

Texas cites just one other case on this point. But in *Anderson v. Edwards*, the plaintiff could offer only one tangential and hypothetical application that might be preempted. 514 U.S. 143, 155 n.6 (1995) (no facial preemption based on "a possible application of the rule . . . [that] violated federal law"). The situation here is completely the opposite, because the executive order is preempted in the overwhelming majority of cases, and Texas can only offer isolated and vague hypothetical situations in which it might be valid. PI Opp. 16. For instance, it says DPS might "orient[] its enforcement around federal determinations." *Id.* But that was true in *Arizona*, where state arrests theoretically could have been made with DHS's input, but the Court still struck down the statute in full. 567 U.S. at 408. And here, DPS could not "orient" around federal determinations given that the order's categories do not exist in federal law, PI Br. 14, and DHS does not want the order enforced. Texas's faint attempt to hypothesize a valid application does not save the order. Even outside the preemption and foreign-affairs contexts, courts have rejected such a wooden application of *Salerno*. *See, e.g.*, *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728-29 (7th Cir. 2021) ("It is always possible to imagine" some outlier scenario in which a law might be valid, "but that is not what the Supreme Court had in mind in *Salerno*.").

Finally, even if the strictest version of *Salerno* applied, the executive order would still be invalid. In every case, the order's enforcement mechanism requires state officers to detain based on their own immigration status determinations. That is true regardless of whom the order is enforced against—private individuals, nonprofit organizations, commercial transportation providers, local governments, contractors, or anyone else. Texas has suggested it could apply the order to municipal transport, *US v. Texas*, Dkt. 42-1 ("Hearing Br."), but directing DPS officers to stop city buses and question passengers about their immigration status would threaten to impinge on foreign affairs and harass noncitizens (and citizens) no less than stopping private vehicles. *See*

11

*Arizona*, 567 U.S. at 408-09.  And barring public transport would undermine asylum seekers' federal rights and responsibilities the same as barring private transport.[3]  As the El Paso County Judge has explained, the consequences would be devastating.  Samaniego Decl., Dkt. 25-2 at 2-4.

## E.  Texas's Belief that DHS Is Violating the Law Does Not Empower It to Thwart the Federal System.

Texas contends that the order can survive because the State alleges DHS is releasing people illegally.  PI Opp. 20-23.  But, as an initial matter, Texas makes no attempt to develop its theories that releases are illegal.  It offers almost no explanation other than to quote the text of two statutes and assert without elaboration that "[e]xceptions to th[e] [Title 42] rule are themselves unlawful." *Id.* at 21.  It does not cite any evidence about federal processing or any other facts necessary to evaluate its assertions.  The court should deem the entire argument waived.

In any event, this argument misunderstands how preemption works.  The executive order clashes with "the system *Congress* created," *Arizona*, 567 U.S. at 408 (emphasis added), which bars unilateral state immigration arrests and gives paroled asylum seekers the right to live, work, and move within the United States.  *See id.* at 399 (preempted laws were "an obstacle" to "the full purposes and objectives of Congress").  The order contravenes Congress's design regardless of whether DHS violates a statute in any individual case, and regardless of which exceptions are in the Title 42 order.  It would turn federal supremacy upside down if States could deploy their

---

[3] Texas has invoked *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004), where the Court declined to apply a preemption provision to municipalities.  But *Nixon* turned largely on the fact that applying the statute to municipalities would raise a host of anomalies, none of which are present here.  *Id.* at 134-38.  And in any event, in the immigration and foreign affairs contexts, courts regularly invalidate state laws that apply to municipal actors.  *See, e.g.*, *Arizona*, 567 U.S. at 407-10 (invalidating state law that regulated local officials' authority); *Farmer's Branch*, 726 F.3d at 529-31 (invalidating rental ordinance including as to municipal landlords); *Alabama*, 691 F.3d at 1290-96 (municipal employers and contracts); *Crosby*, 530 U.S. at 367 (invalidating state law that specifically regulated state and local entities).

officers to thwart a federal scheme anytime a State thinks an agency is acting outside its authority. The States' proper remedy is simply to sue, as Texas has.[4]

### III.     The Order Violates Intergovernmental Immunity.

Texas claims it can discriminate against or bar entities from working with the federal government, as long as the entity does not have a federal contract. PI Opp. 23-25. But unsurprisingly it cites no case holding that States can obstruct federal operations in this way, or that States can force the federal government to use contracts instead of other arrangements with its service providers. As DHS has explained, barring Plaintiffs' assistance would severely undermine the federal scheme in practice. *See* U.S. TRO Br. 1-2; TRO Reply 1. And as Plaintiffs have explained, Texas's argument is incompatible with the basic purposes of the immunity doctrine, PI Br. 18, to which Texas does not respond directly. Its main argument is that previous cases have primarily addressed contractors. PI Opp. 24. But it hardly validates Texas's interference to say that States have not previously tried to interfere with federal operations in exactly the same way.

### IV.     Texas's First-to-File Argument Is Meritless.

Texas seeks to avoid an injunction based on a transfer motion it has never filed in this case. PI Opp. 26. But even were it to seek transfer, there is no substantial overlap with *Texas v. Biden*, No. 4:21-cv-579 (N.D. Tex.), as the United States has explained. The cases raise completely different claims against different defendants. And the cases share no disputed material facts.

Nor is there any real chance of conflict. The executive order's validity and Texas's claims in the other case have no bearing on each other. As explained, even if DHS were violating its governing statutes, that would not validate the order's many conflicts with Congress's scheme.

---

[4] Texas has cited *Matter of Cajun Electric Power Co-op, Inc.*, but there the Court simply refused to enforce an invalid agency regulation in an enforcement action. 109 F.3d 248 (5th Cir. 1997).

Texas's main claim, moreover, is narrow: It challenges only one of the seven Title 42 exceptions. *See* Compl., *Texas v. Biden*, Dkt. 1 at 21-30.  Whether the CDC should include six or seven exceptions has little to do with whether Texas can sweepingly ban the transport of migrants.

Courts hearing allegedly "second"-filed cases regularly reject transfer even where the connection between the cases is much tighter than here.  *See Int'l Fidelity Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (affirming no substantial overlap where "the proof adduced would not be identical") (cleaned up); *Hart v. Donostia LLC*, 290 F. Supp. 3d 627, 631 (W.D. Tex. 2018) (Cardone, J.) (no substantial overlap for two FLSA cases involving subset classes because the "core issue[s]" were different and "the outcome of one is not necessarily dispositive of the other"); *BNSF Ry. Co. v. OOCL (USA), Inc.*, 667 F. Supp. 2d 703, 709 (N.D. Tex. 2009) ("merely some relation" not enough).

Here, transfer would waste judicial resources, given that this Court has invested significant time and energy in these issues.  Transfer, moreover, would do enormous prejudice to Plaintiffs and the United States, because the TRO is set to expire on August 27.

V.      **The Equities Strongly Favor an Injunction.**

Texas dismisses the order's effects on migrants, their families, shelters, and others as mere "inconveniences."  PI Opp. 20.  That vastly understates the damage of stranding thousands of people at the border, shutting down shelter systems, impeding humanitarian assistance, blocking people from getting vaccines and testing, preventing families from traveling together and schoolchildren from taking the bus.  PI Br. 7-8, 19; Harbury Decl. ¶¶ 23-25; Garcia Decl. ¶¶ 6-7; Sandefur Decl. ¶¶ 13-14; Espinosa Decl. ¶¶ 12-14; Samaniego Decl. 2-4; Pimentel Decl. ¶¶ 11-12.

On the other side of the scale, Texas makes almost no effort to explain how the executive order would actually promote public health.  Its primary justification is that lower vaccination rates

14

in migrants' home countries puts them at higher risk of COVID-19.  EO at 1; PI Opp. 4.  But if the Governor's goal was really just to limit the movement of people at higher risk of infection, the order is a bizarre way to do that.  It bars transport for *vaccinated* migrants, and migrants who recently tested negative, and migrants who entered the country before the pandemic—none of whom are at higher risk.  And it does nothing to restrict the movement of the millions of Texans who are unvaccinated, or even people who have *active* infections.  The order would corral people at the border and block access to shelters offering vaccines, testing, and quarantine.  Garcia Decl. ¶ 7; Samaniego Decl. 2-4; Pimentel Decl. ¶¶ 11-12.  It makes no sense as a public health measure.

Texas also has no credible evidence that released asylum seekers are uniquely spreading COVID-19—because they are not.  They are a tiny population compared to the tens of thousands of Texans who test positive each day, *see* Cheung Decl., Dkt. 25-3 ¶ 2 (one-week average of 15,000 daily cases), and compared to the 150,000 people who cross the Mexico-Texas border each day, *id.* ¶ 4; *compare id*. ¶ 6 (approximately 2,500 asylum seekers processed and potentially released per day).  And recent data shows that "migrants generally test positive at similar or lower rates than Americans living in the counties where they are tested."  Michelle Hackman, *Why Illegal U.S. Border Crossings Likely Aren't Fueling the COVID-19 Surge*, Wall St. J. (Aug. 21, 2021) ("Most public-health experts say it isn't likely that migrants are contributing significantly to transmissions within the U.S., since nearly all are tested and quarantined before release, and because the Delta variant is already widespread.").  And while Texas focuses on vaccination rates, both Mexico and Central America have lower *infection* rates than the United States.  Hackman, *supra* (quoting NIH Director); Dkt. 4-6 at 4.

Texas's evidence, meanwhile, dissolves on inspection.  It cites a sensational headline about a 900% *increase* in positivity among some migrants, PI Opp. 5, but *absolute* numbers were so

15

small as to make the percentage change meaningless: The article identifies only about 10 migrants per day testing positive in the Rio Grande Valley out of 2,000 daily apprehensions.[5]  Texas claims that migrants are uniquely vulnerable to COVID-19, PI Opp. 5, but DHS has concluded that asylees and refugees are "younger and healthier on average than the citizen population," and therefore *less* vulnerable.[6]  Texas highlights a single case where infected individuals went to a restaurant without masks, PI Opp. 21; EO at 2, yet the Governor had forbidden localities from requiring masks.  PI Br. 16; *see State v. Biden*, 2021 WL 3674780, *14 (5th Cir. Aug. 19, 2021) ("The self-inflicted nature of the government's asserted harm 'severely undermines' its claim for equitable relief.").[7]

## CONCLUSION

The Court should issue a preliminary injunction.

---

[5] Texas also cites a similar and outdated report from March about detained migrants in Brownsville, but that too involved a tiny number of migrants—an increase of 77 positive cases over one week.  *See* Greg Norman, *Number of COVID-positive migrants released in Texas surges, officials say*, Fox News (Mar. 8, 2021), https://tinyurl.com/r58kmx4w.

[6] DHS Office of Immigration Statistics, *COVID-19 Vulnerability by Immigration Status*, 1, 15 (May 2021), https://tinyurl.com/58ksdapp.

[7] Texas has also cited a declaration about positivity rates by a Laredo health official, *see* Treviño Decl., but the official does not say how many people were tested, or how they were selected.  And Texas's supposed concern for Laredo rings hollow, because the State has specifically singled out Laredo as a place where the order would strand migrants and limit their ability to travel to testing and vaccination resources.  Hearing Br. 57; *see also* Samaniego Decl. 2-3.

16

Dated: August 25, 2021

Respectfully Submitted,

/s/ Spencer Amdur

Adriana Pinon, TX Bar No. 24089768
Kathryn Huddleston*
Bernardo Rafael Cruz*
Brantley Shaw Drake*
Andre Segura*
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
apinon@aclutx.org
khuddleston@aclutx.org
brcruz@aclutx.org
sdrake@aclutx.org
asegura@aclutx.org

Spencer Amdur*
Katrina Eiland*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
samdur@aclu.org
keiland@aclu.org
cwofsy@aclu.org

Omar Jadwat*
Noor Zafar*
Ming Cheung*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org
mcheung@aclu.org

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice*

17

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2021, I electronically filed the foregoing with the

Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this

document has been served via the Court's CM/ECF system on all counsel of record.


*/s/ Spencer Amdur*
Spencer Amdur

18